*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

**26 CV 993**

CAROLETTE MEADOWS,

Plaintiff,

v.

FILED
MAY 1 4 2026
ANDREW W. MOELLER. CLERK
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NY

BUFFALO POLICE DEPARTMENT; CITY OF BUFFALO;

DIANE WRAY, individually and in her official capacity;

ERIE COUNTY;

ERIE COUNTY DISTRICT ATTORNEY'S OFFICE;

MICHAEL KEANE, individually and in his official capacity;

JOHN FLYNN, individually and in his official capacity;

DETECTIVE LON FOLTS, individually and in his official capacity;

ADA RYAN EMMERLING; ADA JOHN SCHOEMICK; JOSEPH GRAMAGLIA; ALFONSO WRIGHT; ADA MILTON GORDON; SPECIAL PROSECUTOR STEPHEN DILORENZO; SPECIAL PROSECUTOR CHRIS STAROSIK;

RACHEL ECKERT;

LT. JOHN DOE of Buffalo City Jail;

JOHN DOE 1 and JOHN DOE 2 of Buffalo City Jail;

JANE DOE 1 and JANE DOE 2 of Buffalo City Jail;

JOHN DOE 1 and JOHN DOE 2 — Erie County Investigators (ECI);

JANE DOE 1 — Erie County District Attorney's Office;

Defendants.

Civil Action No.: _____

# AMENDED CIVIL RIGHTS COMPLAINT

(42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986; ADA; Fair Housing Act; First, Fourth, Fifth & Fourteenth Amendments)

## JURY TRIAL DEMANDED

## PRELIMINARY STATEMENT

Plaintiff Carolette Meadows, a Black disabled homeowner, brings this action against numerous state actors, municipal entities, and one private citizen for a sustained, multi-year campaign of racial discrimination, retaliation, malicious prosecution, excessive force, unlawful arrest and detention, deprivation of property rights, and deliberate denial of medical care — all conducted under color of law and in willful violation of Plaintiff's rights under the United States Constitution, federal civil rights statutes, the Americans with Disabilities Act, and the Fair Housing Act.

Plaintiff has been arrested fifteen (15) times at the instigation of her white neighbor, Rachel Eckert, without a single resulting conviction. These arrests were made possible by a pattern of racial bias and selective enforcement by the Buffalo Police Department (BPD), by prosecutorial misconduct and malicious prosecution by the Erie County District Attorney's Office (ECDA) — first under former DA John Flynn (2020–March 29, 2024) and currently under DA Michael Keane — and by a coordinated effort among Defendants to silence, injure, dispossess, and humiliate Plaintiff because of her race, disability, and her exercise of constitutionally protected speech.

Although Erie County, John Flynn, Rachel Eckert, and ADA John Schoemick were dismissed from prior federal litigation (No. 1:21-cv-00449) on narrow procedural grounds — failure to establish Monell liability as to governmental defendants, private citizen status as to Eckert, and failure to timely amend as to Schoemick and Flynn — Plaintiff re-files against all four under the continuing wrong doctrine, and now names DA Michael Keane for his direct involvement in the October 2024 arrest and the eleven-month malicious prosecution that followed. Eckert is named under the Fair Housing Act, 42 U.S.C. §§ 3604, 3617, 3631, and 42 U.S.C. §§ 1981, 1982, and

1985, which provide federal causes of action against private actors who interfere with housing rights through racially motivated conduct. Eckert has filed at minimum five separate state court proceedings against Plaintiff since 2021, including a verified complaint in which she expressly targeted Plaintiff's federal civil rights lawsuit as malicious prosecution, and a prosecution for Criminal Use of a Biological Weapon arising from a cough — dismissed by a Grand Jury for lack of probable cause. These acts, taken together, constitute the most sustained documented campaign of racially motivated judicial harassment in the record of this Court, and 42 U.S.C. §§ 1981, 1982, and 1985, which provide federal causes of action against private actors who interfere with housing rights through racially motivated conduct. ADA John Schoemick is re-named pursuant to the continuing wrong doctrine. Schoemick was previously terminated from No. 1:21-cv-00449 by the March 14, 2024 order of Hon. Lawrence J. Vilardo — not on the merits of his individual immunity, but as a result of Plaintiff's failure to file a timely amended complaint within the court's 45-day window. No court has ever adjudicated whether Schoemick's investigative-phase conduct is shielded by absolute immunity. Because that question was never reached, there is no res judicata bar to asserting it here.

8A. CONTINUING VIOLATION DOCTRINE — STATUTE OF LIMITATIONS. Section 1983 claims in New York are subject to a three-year statute of limitations. Pauk v. Bd. of Trustees, 654 F.2d 856 (2d Cir. 1981). All events giving rise to claims in this complaint occurring from October 2024 through July 2025 are well within the three-year limitations period. To the extent Plaintiff relies on events predating October 2024 as evidence of the pattern, custom, and practice underlying her Monell claims — including the prior arrests, the prior federal lawsuit, the prior NYSDHR findings, and ADA Schoemick's investigative-phase conduct in the prior case — those events are not asserted as standalone claims subject to the limitations period but as pattern evidence supporting timely claims. Additionally, under the continuing violation doctrine recognized by the Supreme Court in National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), where a defendant's wrongful acts form a continuous, unbroken pattern extending into the limitations period, the entire course of conduct is actionable. The discriminatory and retaliatory conduct of all Defendants against Plaintiff has been continuous and unbroken from at least 2020 through July 2025, with each new arrest, prosecution, and act of retaliation constituting a fresh act within — and renewing — the limitations period.

## INTRODUCTION

1. This is a complaint for injunctive relief and compensatory and punitive damages brought pursuant to 42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986; the Americans with Disabilities Act of 1990 and ADA Amendments Act of 2008; Title VII of the Civil Rights Act of 1964; Title II of the ADA; the Fair Housing Act (42 U.S.C. §§ 3604, 3613, 3617, 3631); 18 U.S.C. § 242; and the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

2. Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1343. Plaintiff further invokes supplemental jurisdiction pursuant to 28 U.S.C. § 1367 for pendent state law claims.

3. Venue is proper in the Western District of New York pursuant to 28 U.S.C. § 1391(b) because all Defendants reside or do business within this District and all events giving rise to this Complaint occurred here.

## CONTINUING WRONG — BASIS FOR RE-FILING AGAINST PREVIOUSLY DISMISSED DEFENDANTS

4. Plaintiff invokes the continuing wrong doctrine as the legal basis for re-filing against John Flynn, Erie County, and Rachel Eckert, each of whom was dismissed from prior federal action No. 1:21-cv-00449.

5. The continuing wrong doctrine provides that when a defendant's wrongful acts form a continuous, unbroken pattern extending into the present limitations period, the statute of limitations does not bar claims arising from the entire course of conduct. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002); Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982).

6. John Flynn served as Erie County District Attorney from approximately 2020 through March 29, 2024. During his tenure, he oversaw and directed the ECDA's pattern of malicious prosecution against Plaintiff, failed to investigate Eckert's fraudulent claims, withheld exculpatory evidence, and permitted the use of prosecutorial resources as instruments of retaliation against a Black homeowner who had successfully defended against every prior charge. The policies and practices Flynn established as DA form the foundational predicate for the continued misconduct of his successor, Michael Keane.

7. Erie County's liability has grown materially since the dismissal in 1:21-cv-00449. The pattern of systemic discrimination, failure to train and supervise, retaliatory property violations, ADA violations, and denial of equal access to governmental services now constitutes overwhelming evidence of a Monell custom, policy, or practice of constitutional violations targeting Black residents and Plaintiff in particular. Monell v. Dep't of Social Services, 436 U.S. 658 (1978).

8. Rachel Eckert's wrongful conduct has also continued unabated, escalating in intensity and public reach since the prior dismissal, as set forth in full in the Parties and Statement of Claim sections below.

## PARTIES

### Plaintiff

9. CAROLETTE MEADOWS ("Plaintiff") is a Black, disabled homeowner residing at 281 Barnard Street, Buffalo, NY 14202, where she has lived for more than fifteen (15) years. Plaintiff is a qualified individual under the ADA, suffering from lupus and related conditions requiring daily medication.

### Municipal and Governmental Defendants

10. Defendant BUFFALO POLICE DEPARTMENT ("BPD") is a law enforcement agency of the City of Buffalo, New York.

11. Defendant CITY OF BUFFALO is a municipality within Western New York and is the legal employer of BPD officers and Buffalo City Jail staff.

12. Defendant BUFFALO CITY COURT is a municipal court located at 50 Delaware Avenue, Buffalo, NY 14202.

13. Defendant ERIE COUNTY is a municipal entity located at 95 Franklin Street, Buffalo, NY 14202, and is the legal employer of Erie County District Attorney staff and Erie County Investigators.

14. Defendant ERIE COUNTY DISTRICT ATTORNEY'S OFFICE ("ECDA") is a governmental office within Erie County, New York, responsible for criminal prosecution within the county.

### Individual Government Defendants

15. Defendant JOHN FLYNN was the duly elected District Attorney of Erie County from approximately 2020 through March 29, 2024, residing at 26 Quaker Ridge, Tonawanda, NY 14150. At all times during his tenure, Flynn acted under color of state law in his individual and official capacity. Flynn established, directed, and maintained the discriminatory and retaliatory prosecutorial policies that were carried forward by his successor. Flynn is named under the continuing wrong doctrine for conduct spanning his entire tenure that contributed to and enabled the acts complained of herein.

16. Defendant MICHAEL KEANE is the current District Attorney of Erie County. He is sued in his individual and official capacity. NOTE: Michael Keane (Erie County DA) is a distinct individual from retired Judge Kevin Keane (Buffalo City Court), who are brothers. All references to "DA Keane" or "Keane" herein refer exclusively to District Attorney Michael Keane. DA Keane authorized and oversaw the malicious prosecution of Plaintiff arising from her October 11, 2025 arrest, persisting for nearly one year with full knowledge that Plaintiff's neighbor was not a viable victim and that no legitimate basis for prosecution existed.

17. Defendant DIANE WRAY was a judge elected to Buffalo City Court, residing at 343 Starin Avenue, Buffalo, NY 14216. She is sued in her individual and official capacity for acts taken outside the protection of judicial immunity, including conducting an ex parte investigation into the Plaintiff's identity, making prejudicial statements from the bench, compelling Plaintiff to surrender property rights under threat of extended detention, and refusing to permit Plaintiff to read charging documents or proceed pro se at arraignment.

18. Defendant DETECTIVE LON FOLTS is a detective within the BPD, residing at 2704 Lake Road, Silver Creek, NY 14136. He is sued in his individual and official capacity.

19. KARLA ZIMMERMAN is an attorney at the Legal Aid Bureau of Buffalo. She is not named as an individual defendant in this action. Her conduct is alleged herein as factual evidence of the Legal Aid Bureau's participation in the pattern of state-aligned interference with Plaintiff's defense, and as evidence supporting the ECDA's conspiracy claims, as set forth in the Statement of Claim and Count IV.

20. NOTE: The Legal Aid Bureau of Buffalo is not named as a defendant in this action. The conduct of its attorney Karla Zimmerman is alleged herein as factual evidence supporting the malicious prosecution and conspiracy claims against the ECDA defendants, as set forth in detail in the Statement of Claim.

20A. Defendant JOHN SCHOEMICK, residing at 2655 Sheridan Dr. Tonawanda, NY 14150, is a former Assistant District Attorney employed by the Erie County District Attorney's Office. He was previously named as a defendant in Plaintiff's prior federal action, No. 1:21-cv-00449 (W.D.N.Y., Hon. Lawrence J. Vilardo), and was terminated from that case by order dated March 14, 2024, following Plaintiff's failure to file a timely amended complaint — not as a result of any merits adjudication of his individual immunity or liability. No court has ruled that ADA Schoemick's conduct was protected by absolute prosecutorial immunity. He is named in this action in his individual capacity for conduct performed during the investigative phase of criminal proceedings against Plaintiff, which falls outside the scope of absolute prosecutorial immunity under Burns v. Reed, 500 U.S. 478 (1991) and Buckley v. Fitzsimmons, 509 U.S. 259 (1993). Schoemick is re-named in this action pursuant to the continuing wrong doctrine, as his prior investigative-phase conduct is part of the same unbroken pattern of constitutional violations against Plaintiff that extends through the present.

21. Defendants LT. JOHN DOE, JOHN DOE 1, JOHN DOE 2, JANE DOE 1, and JANE DOE 2 of Buffalo City Jail are detention staff employed by the City of Buffalo. They are sued in their individual and official capacities.

22. Defendants JOHN DOE 1 and JOHN DOE 2 — Erie County Investigators (ECI) — are investigators employed by Erie County. They are sued in their individual and official capacities.

23. Defendant JANE DOE 1 of the Erie County District Attorney's Office is an assistant district attorney employed by Erie County. She is sued in her individual and official capacity.

23A. Defendant ADA RYAN EMMERLING is an Assistant District Attorney employed by the Erie County District Attorney's Office. He/She is sued in his/her individual and official capacity for making two separate requests to two different judges to enforce the distance requirement of the restraining order in a manner that, if granted, would have required Plaintiff — a homeowner and long-time resident of 281 Barnard Street — to vacate her own property. This conduct exceeded any legitimate prosecutorial function and was taken in furtherance of Defendant Eckert's stated goal of dispossessing Plaintiff from her home. To the extent this conduct was taken in the investigative or administrative phase rather than the advocacy phase of the prosecution, ADA Ryan Emmerling is entitled only to qualified immunity under Burns v. Reed, 500 U.S. 478 (1991). NOTE TO PLAINTIFF: Please confirm ADA Ryan Emmerling's first name and gender before filing and update this paragraph accordingly.

24. NOTE REGARDING BPD OFFICER DEFENDANTS: Officers Prana, Sullivan, Garry, Melligan, Maciejewski, Moriarty, Larusch, DiPasquale, and McDermott are already named as

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

defendants in pending Case No. 1:21-cv-00449 (W.D.N.Y.). They are not re-named as defendants in this action. Their conduct is incorporated herein as factual and Monell pattern evidence. Upon consolidation of this action with 1:21-cv-00449, all claims against these BPD officer defendants will be addressed in the unified proceeding before Hon. Lawrence J. Vilardo.

24A. NOTE REGARDING OFFICER DIPASQUALE AND DETECTIVE MCDERMOTT: These BPD officers are already named as defendants in the pending related case No. 1:21-cv-00449 (W.D.N.Y., Hon. Lawrence J. Vilardo). They are not named as defendants in this new action to avoid claim splitting. Their individual conduct — including Officer DiPasquale's statement that he "would've done the same thing" as Eckert in assaulting Plaintiff, and Detective McDermott's documented asymmetric evidentiary standards — is alleged herein as factual evidence supporting the Monell claims against the City of Buffalo and BPD, and as pattern evidence supporting the conspiracy and equal protection claims. Upon consolidation of this action with 1:21-cv-00449 pursuant to the accompanying Motion to Consolidate, all claims against DiPasquale and McDermott will be addressed in the consolidated proceeding.

24B. NOTE: Detective McDermott is also already a defendant in Case No. 1:21-cv-00449 and is not re-named as an individual defendant in this action. Her documented conduct — including applying asymmetric evidentiary standards that demanded proof from Plaintiff while accepting Eckert's unsubstantiated complaints without inquiry — is alleged herein as Monell pattern evidence and will be addressed in the consolidated proceeding.

24C. Defendant JOSEPH GRAMAGLIA, residing at 309 Woodbridge Ave, Buffalo Ny 14214 , was the Deputy Commissioner of the Buffalo Police Department during the period 2020-2021 and subsequently served as Commissioner. He is sued in his individual and official capacity. Plaintiff made direct, documented contact with Gramaglia in December 2020 seeking his assistance in addressing BPD's discriminatory handling of her complaints. Gramaglia stated he would contact Chief Joyce of A-District. Chief Joyce never contacted Plaintiff. Plaintiff then contacted Gramaglia repeatedly on the following specific dates: January 5, 6, 7, 11, and 19, 2021; February 23, 24, and 25, 2021; and March 1, 8, 12, 16, and 18, 2021. Gramaglia did not respond to any of these contacts. This documented pattern of non-response to direct, repeated notifications of constitutional violations establishes actual notice and deliberate indifference at the supervisory policymaker level, creating personal supervisory liability under Colon v. Coughlin, 58 F.3d 865 (2d Cir. 1995), and Monell liability for the unconstitutional custom he permitted to continue.

24D. Defendant ALFONSO WRIGHT was the Commissioner of the Buffalo Police Department at the time of the relevant 2024 and October 2025 arrests, having served as Deputy Commissioner under Gramaglia. He is sued in his individual and official capacity. As

Commissioner, Wright was the final policymaker for BPD under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986). Wright served as Commissioner during the period when: (a) the $28 million Walker verdict and $80 million Boyd verdict against the ECDA were publicly reported; (b) Plaintiff's February 2025 Internal Affairs complaint was received by BPD; (c) the pattern of fifteen arrests with zero convictions was fully documented in BPD's own records; and (d) the Fourth Department's July 2023 ruling in Meadows v. Eckert established that Eckert's cameras were unlawful harassment and that Eckert had no validated easement. Wright's failure to implement any corrective policy, investigate the pattern of discriminatory enforcement, or respond to Plaintiff's IA complaint constitutes deliberate indifference at the policymaker level independently establishing Monell liability.

24E. Defendant ADA MILTON GORDON is an Assistant District Attorney employed by the Erie County District Attorney's Office who was assigned to handle Plaintiff's complaints against Eckert in August 2020. He is sued in his individual and official capacity for conduct in the investigative phase of case management, including: (a) failing to respond to Plaintiff's numerous contacts and documentation including property surveys, medical records, and evidence of Eckert's racially charged social media posts; (b) telling Plaintiff to "be courteous" if she wanted to be deemed "credible" — conditioning the seriousness with which he evaluated her civil rights complaints on her demeanor toward him; and (c) ultimately filing only a misdemeanor charge against Eckert in December 2020 over Plaintiff's objection, despite the felony nature of the May 2020 assault that put Plaintiff in the hospital with a collapsed lung. Gordon's investigative-phase conduct falls outside absolute prosecutorial immunity under Burns v. Reed, 500 U.S. 478 (1991).

24F. SPECIAL PROSECUTOR STEPHEN DILORENZO is an attorney who acted as Special Prosecutor on behalf of the Erie County District Attorney's Office for Plaintiff's criminal complaints against Eckert relating to the COVID biological weapon incident. DiLorenzo is referenced herein not as an individual damages defendant but as additional evidence of the ECDA's Monell custom of protecting Eckert from accountability: DiLorenzo deliberately withheld from the Grand Jury both (a) the video evidence of Eckert deliberately coughing COVID on Plaintiff through the fence and making threats, and (b) Buffalo City Court transcripts showing Eckert's own attorney told the court Eckert would not appear due to COVID quarantine. This deliberate withholding of material evidence from the Grand Jury resulted in a no-bill. DiLorenzo also made a verbal agreement with Plaintiff not to lower Eckert's charges further, which his successor then violated.

24G. SPECIAL PROSECUTOR CHRIS STAROSIK is an attorney who replaced DiLorenzo as Special Prosecutor for the ECDA. Starosik is referenced herein not as an individual damages defendant but as additional Monell evidence: Starosik violated the verbal agreement DiLorenzo had made with Plaintiff and informed Plaintiff he intended to offer Eckert a plea to harassment,

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

stating Plaintiff "had no choice in the matter because I am the prosecutor." All charges against Eckert were ultimately dismissed by Judge Jahaar Pridgen based on a defense motion finding the ECDA created a disqualifying conflict of interest by handling Eckert's cases, filing for trial readiness, and only then recusing in favor of a special prosecutor. The conflict of interest finding itself constitutes evidence of the ECDA's institutionalized mishandling of cases involving Eckert.

24H. MICHELLE LONG is a FOIL Officer employed by the Buffalo Police Department. She is identified herein as an individual whose conduct is relevant to both the Monell claim and the due process claim. On March 7, 2026, Long fulfilled FOIL Request No. 25-335, Case ID 1001988251, submitted by Rachel Eckert, releasing bodycam footage from Plaintiff's private property to Eckert without verifying Eckert's false claim of victim status, without conducting a privacy analysis, without notifying Plaintiff, and without checking whether active federal civil rights litigation existed between Eckert and the person depicted in the footage. Long is a named witness whose deposition is material to the Monell and due process claims in this action. Plaintiff reserves the right to add Long as an individual defendant upon completion of discovery establishing the scope of her personal participation in the constitutional deprivation.

**Private Defendant**

25. Defendant RACHEL ECKERT is Plaintiff's white neighbor, residing at 277 Barnard Street, Buffalo, NY 14202. Although previously dismissed from federal action No. 1:21-cv-00449 as a private citizen, Eckert is properly named as a defendant in this action under federal statutes that expressly provide causes of action against private individuals: 42 U.S.C. § 1982 (property rights of citizens), 42 U.S.C. § 1981 (equal rights under law), 42 U.S.C. § 1985(3) (conspiracy to deprive of rights), the Fair Housing Act at 42 U.S.C. §§ 3604, 3617, and 3631, and 18 U.S.C. § 242. As further detailed below, Eckert engaged in racially motivated conduct, fraudulent misrepresentation to law enforcement, and a sustained campaign to drive Plaintiff from her home, all of which constitute actionable violations of federal law by private actors.

## LEGAL BASIS FOR CLAIMS AGAINST PRIVATE DEFENDANT RACHEL ECKERT

Federal law provides multiple independent bases to sue a private citizen who interferes with another's housing rights on account of race:

### A. Fair Housing Act — 42 U.S.C. §§ 3604, 3617, 3631

The Fair Housing Act prohibits any person — private or governmental — from making a dwelling "unavailable" to any person on account of race (§ 3604(a)), or from interfering, coercing, threatening, or intimidating any person in the exercise of their fair housing rights (§ 3617). Section 3631 imposes criminal liability — and supports a civil cause of action — upon any person who, by force or threat of force, willfully injures, intimidates, or interferes with any person because of race in the enjoyment of a dwelling. Intentional conduct designed to pressure a minority homeowner into leaving her home violates the FHA regardless of whether the actor is a state actor. See, e.g., Ohana v. 180 Prospect Place Realty, 996 F. Supp. 238 (E.D.N.Y. 1998); United States v. Branella, 972 F. Supp. 294 (D.N.J. 1997).

## B. 42 U.S.C. § 1982 — Property Rights

Section 1982 guarantees all citizens the same right "to inherit, purchase, lease, sell, hold, and convey real and personal property." Private interference with that right motivated by racial animus is actionable under § 1982 without any showing of state action. Jones v. Alfred H. Mayer Co., 392 U.S. 409 (1968).

## C. 42 U.S.C. § 1985(3) — Conspiracy to Deprive of Rights

Section 1985(3) creates a cause of action against private conspirators who deprive persons of equal protection of the laws or equal privileges and immunities, where the conspiracy is motivated by racial animus. Griffin v. Breckenridge, 403 U.S. 88 (1971). Eckert's coordinated use of law enforcement, fraudulent court documents, and public media campaigns to deprive Plaintiff of her property and liberty, in concert with state actors, satisfies this standard.

## D. 42 U.S.C. § 1981 — Equal Rights Under Law

Section 1981 guarantees all persons the same right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." Eckert's systematic efforts to use the legal system as a weapon against Plaintiff, while fraudulently misrepresenting Plaintiff's rights, interferes with Plaintiff's right to the equal benefit of the law on account of race.

## FACTUAL ALLEGATIONS — DEFENDANT RACHEL ECKERT

26. Defendant Eckert is Plaintiff's white neighbor who has, over a period of years, orchestrated a systematic campaign to drive Plaintiff from her home through abuse of legal process, fraudulent misrepresentation, and racial intimidation.

27. Eckert has caused Plaintiff to be arrested fifteen (15) times without a single resulting conviction.

28. In initiating each such arrest, Eckert knowingly and intentionally misrepresented to law enforcement the contents of court case index number 805300/2020, falsely claiming that said order gave Eckert an easement over Plaintiff's property. In fact, the order established that it was Plaintiff — not Eckert — who held easement rights. Eckert presented and misrepresented actual court documents to police as if they supported her claim, which they did not.

29. Eckert's fraudulent misrepresentation of court papers to law enforcement in order to have Plaintiff unlawfully arrested and jailed — including the arrest of October 11, 2025 — constitutes knowing and intentional use of fraudulent legal instruments to deprive Plaintiff of her liberty and property. This conduct rises to the level of a private conspiracy with state actors to deprive Plaintiff of her constitutional rights in violation of 42 U.S.C. § 1985(3).

30. In court proceedings related to case number 805300/2020, Eckert admitted on the record — as reflected in a certified transcript — that she intentionally injected racial framing into her dispute with Plaintiff when race was not relevant. Specifically, Eckert acknowledged that she deliberately made the neighbor dispute "racial" in nature. This admission constitutes direct evidence of racially motivated conduct.

31. Eckert has maintained an ongoing campaign on social media to frame her dispute with Plaintiff in racially inflammatory terms. This campaign has incited white individuals to direct violent and threatening communications toward Plaintiff on social media platforms, creating a racially hostile environment that has interfered with Plaintiff's peaceful enjoyment of her home.

32. Eckert appeared on a podcast associated with the acronym "B.A.N.G." — described as a white "patriot" platform — during which she again characterized her dispute with Plaintiff in racial terms. During this broadcast, Eckert displayed video footage of Plaintiff, Plaintiff's home, and Plaintiff's vehicle — including its license plate number — thereby publicly disseminating Plaintiff's identifying information and exposing Plaintiff to potential physical danger.

33. Eckert has expressly stated in open court, during an appearance before Judge Ward, that her goal is to "make Meadows move" by obtaining a court judgment large enough that Plaintiff cannot pay, so that the Erie County Sheriff can be used to sell Plaintiff's home. This statement constitutes direct evidence that Eckert's purpose is to deprive Plaintiff of her home on account of race — a textbook violation of the Fair Housing Act.

34. In furtherance of her campaign, Eckert has undertaken an organized effort to damage the reputations and political standing of Black elected officials, Black Democratic politicians, and nonprofit organizations that serve the predominantly Black East Side of Buffalo. Specifically, Eckert has combed through their campaign finance records and tax returns and made wild accusations against them publicly, stating explicitly that she is doing so because they "didn't protect her" from Plaintiff Meadows. This conduct demonstrates that Eckert views Black community and political institutions as adversaries and has deployed financial scrutiny as a racially motivated weapon to coerce community support and eliminate any political protection Plaintiff might otherwise receive from her community's elected representatives.

35. The totality of Eckert's conduct — fraudulent legal filings, racially inflammatory social media campaigns, public identification of Plaintiff's home and vehicle, stated intent to dispossess Plaintiff through legal process, and attack on Black political institutions — constitutes a sustained, racially motivated effort to make Plaintiff's home unavailable to her in violation of the Fair Housing Act, 42 U.S.C. §§ 3604, 3617, and 3631, as well as 42 U.S.C. §§ 1981, 1982, and 1985(3).

35A. APRIL 2026 EMERGENCY OSC — MOST RECENT ACT OF JUDICIAL WEAPONIZATION. On April 17, 2026 — while this federal complaint was being prepared — Defendant Eckert filed an Emergency Order to Show Cause in New York Supreme Court, Monroe County (Index No. E2025001693) against Plaintiff, seeking: (a) civil contempt; (b) a temporary restraining order; and (c) a mandatory preliminary injunction directing Plaintiff's "immediate temporary removal and exclusion from the premises." On April 21, 2026, Hon. Erin S. Skinner signed a TRO restraining Plaintiff from entering Eckert's property, communicating about Eckert's siding, or interfering with Eckert's repair operations. (See Exhibit MM — OSC and TRO, Index No. E2025001693.) This is the most recent — and most concrete — manifestation of Eckert's documented goal of using judicial process to dispossess Plaintiff from her home.

35B. ECKERT'S AFFIRMATION CONTAINS A MATERIAL FALSE STATEMENT SUBMITTED UNDER OATH. Eckert's sworn affirmation supporting the OSC states: "In October 2024, Defendant pulled a shotgun on my contractors while repairs were being attempted." This statement is materially false and deliberately misleading in two critical respects

that Eckert deliberately concealed from Justice Skinner: (1) the incident occurred in October 2025, not October 2024; and (2) the criminal charge arising from that incident was dismissed in its entirety by the Erie County District Attorney's Office on June 9, 2025, after the ECDA conceded it could not contest Plaintiff's CPL § 30.30 motion and acknowledged that Eckert was not a viable victim because she was not in the driveway and not in the path of the weapon. The ECDA's own counsel, after reviewing Eckert's own Facebook Live video of the incident, confirmed to defense counsel that Eckert was not a viable victim. Eckert's affirmation presented the October 2025 incident to a Monroe County judge as established misconduct — without any disclosure that the resulting prosecution was dismissed because Eckert was found not to be a victim. This is not an innocent omission. It is the same pattern of fraudulent misrepresentation to legal authorities that has driven every unlawful arrest of Plaintiff in this entire case. Filing a materially false sworn affirmation to obtain an emergency court order is an overt act in furtherance of the § 1985(3) conspiracy and constitutes interference with Plaintiff's housing rights through fraudulent legal process within the meaning of 42 U.S.C. § 3617.

35C. THE TRUTH ABOUT THE OCTOBER 2025 INCIDENT. The facts Eckert omitted from her affirmation are as follows: Plaintiff did display her lawfully owned shotgun on her own property in October 2025. She did so after approximately twenty minutes of sustained verbal abuse by Eckert's contractors who had placed all their equipment on Plaintiff's property without consent, had repeatedly refused Plaintiff's requests to leave, had called Plaintiff "Bitch" numerous times, and had addressed Plaintiff with a racial slur. Plaintiff's display of a lawful firearm on her own property, after two hours of refusal to vacate and racial taunting by multiple individuals, was a lawful act of self-protection. None of the contractors present chose to file any charge against Plaintiff. The ECDA — which prosecuted Plaintiff for eleven months — ultimately conceded the case because Eckert herself was not in the driveway and was not in any danger. These are the facts that Eckert's sworn affirmation to Justice Skinner deliberately concealed.

35D. THE ACTUAL PRECIPITATING FACTS OF THE OSC. The precipitating event for Eckert's April 2026 emergency application was this: Eckert's siding had been hanging over and obstructing Plaintiff's driveway for approximately two months. Plaintiff tolerated this obstruction patiently. On April 16, 2026, Plaintiff sent Eckert a written notice — copied to a court administrative email address — giving Eckert one week to remove her siding from Plaintiff's driveway before Plaintiff would remove the obstructing portion herself. This was a reasonable, proportionate, and legally appropriate property maintenance notice. A landowner whose driveway is obstructed by a neighbor's building materials for two months, after giving written notice and a one-week deadline, has every legal right to remove the obstruction. Eckert responded to this reasonable notice not by fixing her property but by running to court in Monroe County the very next morning to obtain an emergency court order protecting her right to obstruct Plaintiff's driveway indefinitely.

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

35E. FORUM SHOPPING TO AVOID JUDICIAL FAMILIARITY. Eckert filed this OSC in Monroe County Supreme Court despite the fact that both parties reside in Erie County, the property at issue is in Erie County, and all related proceedings — including case 805300/2020 and all Buffalo City Court criminal matters — are pending in Erie County. Filing in Monroe County allowed Eckert to present her emergency application to a judge with no familiarity with the years of Erie County proceedings, the prior dismissals, Judge Wilson's civil directive, the ECDA's acknowledgment that Eckert was not a viable victim, or the prior judicial finding characterizing Eckert's claims as "dubious." This strategic forum selection is consistent with Eckert's pattern of exploiting judicial processes in ways designed to prevent the full context of her conduct from being presented to the deciding court.

35F. THE TRO PROTECTS ECKERT'S OBSTRUCTION OF PLAINTIFF'S PROPERTY. The TRO signed by Justice Skinner on April 21, 2026 restrains Plaintiff from interfering with Eckert's siding or repair operations but imposes no obligation on Eckert to remove her building materials from Plaintiff's driveway. The order effectively requires Plaintiff to allow Eckert's debris to permanently obstruct her own driveway while forbidding Plaintiff from doing anything about it. This mirrors the same dynamic that has recurred throughout this dispute: courts responding to Eckert's complaints by restricting Plaintiff's rights while taking no action to hold Eckert accountable for her ongoing violations of Plaintiff's property rights. Each such court order is itself an act of interference with Plaintiff's FHA-protected rights.

35G. DEFENDANT INTENDS TO REMOVE THE MONROE COUNTY PROCEEDINGS TO FEDERAL COURT. Plaintiff intends to file a Notice of Removal of Monroe County Index No. E2025001693 to this Court pursuant to 28 U.S.C. §§ 1441 and 1443, and to move for consolidation of the removed action with this federal complaint pursuant to Federal Rule of Civil Procedure 42(a). The April 2026 OSC and the TRO are inextricably connected to the Fair Housing Act violations alleged herein and constitute the most recent acts in the continuing pattern of racial discrimination and judicial weaponization that is the subject of this complaint.

35H. ECKERT DELIBERATELY COUGHED COVID ON PLAINTIFF — ECDA SANDBAGGED THE GRAND JURY TO PROTECT ECKERT. On or around September 20, 2021, while Eckert had a confirmed case of COVID-19, she approached Plaintiff's property fence, deliberately coughed on Plaintiff through the fence, and told Plaintiff "take all this covid" and "that's why you got lupus, I hope you die." This conduct was captured on video. When police responded, Eckert admitted to having COVID and admitted coughing at Plaintiff. Plaintiff — a lupus patient for whom COVID exposure is a known and serious health risk — then sought to have Eckert charged under New York Penal Law § 490.55 for Criminal Use of a Chemical or Biological Weapon in the First Degree, a Class A felony. An Erie County Grand Jury convened

on Plaintiff's complaint. The Grand Jury dismissed the charge. However, the dismissal was not a finding that Eckert's conduct was innocent — it was the direct result of the ECDA failing to present the video evidence of Eckert's own admission to the Grand Jury. The ECDA presented this charge as a he-said-she-said matter without the video, leaving the Grand Jury with insufficient evidence to indict. This constitutes a Brady-type violation in reverse: the ECDA withheld material evidence from the Grand Jury that would have supported indictment of a white complainant who had deliberately exposed a Black disabled lupus patient to COVID. This is the same ECDA that — under the same DA Flynn — pursued Plaintiff on facially indefensible charges for eleven months while declining to properly prosecute Eckert for conduct she admitted on camera. The asymmetric handling of these two matters is among the most powerful evidence of the ECDA's pattern of racial bias and preferential treatment of Eckert over Plaintiff.

35I. ECKERT FILED RETALIATORY STATE COURT LITIGATION AGAINST PLAINTIFF'S FEDERAL CIVIL RIGHTS CASE. In May 2022, while Plaintiff's federal civil rights case No. 1:21-cv-00449 was actively pending, Eckert filed a second state court defamation and abuse of process lawsuit against Plaintiff — Index No. 805547/2022, later transferred to Monroe County as E2025001694 — in which she expressly characterized Plaintiff's federal civil rights filing as "false," "fabricated," "over inflated," and made "in bad faith, maliciously, and recklessly with the sole intent to cause significant harm." Eckert's fourth cause of action in that complaint asserts malicious prosecution based in part on Plaintiff's pursuit of her federal civil rights claims. Filing a retaliatory lawsuit against a person for exercising their constitutionally protected First Amendment right to petition courts for redress of grievances is itself an actionable constitutional violation. The right to access courts to pursue civil rights claims is protected by the First Amendment and the Petition Clause. A party who files retaliatory litigation designed to burden, punish, or chill a plaintiff's civil rights litigation engages in conduct independently actionable under 42 U.S.C. § 1983 and the Fair Housing Act. Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731 (1983); BE & K Construction Co. v. NLRB, 536 U.S. 516 (2002).

35J. JUDGE WARD WARNED ECKERT HER FILING PATTERN CONSTITUTES HARASSMENT. Eckert's own verified complaint in Index No. 805547/2022 admits the following at paragraph 43: "Defendant was warned by Hon. Justice Dennis Ward that there comes a point in time where filing lawsuits either become harassment or misuse of the Courts." This admission — made in a sworn, verified complaint — establishes that a sitting New York Supreme Court justice directly warned Eckert that her pattern of litigation against Plaintiff constitutes judicial harassment. This warning is direct evidence of the abuse of process that underlies Plaintiff's federal claims. It corroborates Plaintiff's allegation that Eckert has systematically weaponized legal process against Plaintiff as part of a racially motivated campaign to drive Plaintiff from her home. This admission is particularly significant because it is in Eckert's own words, under oath, in a verified complaint.

35K. THE FULL SCOPE OF ECKERT'S STATE COURT CAMPAIGN. Including the three cases discussed above, Eckert has filed at minimum the following state court proceedings against Plaintiff: (1) Index No. 808096/2021 (Erie County), later transferred to Monroe County as E2023007424 — defamation, abuse of process, IIED against Plaintiff and five Black community members who publicly supported her; (2) Index No. 805547/2022 (Erie County), later transferred to Monroe County as E2025001694 — a second defamation lawsuit filed while Plaintiff's federal civil rights case was pending, expressly targeting Plaintiff's federal filing as malicious prosecution; (3) Index No. E2025001693 (Monroe County) — the April 2026 Emergency OSC seeking civil contempt, TRO, and Plaintiff's removal from her home, obtained through a materially false sworn affirmation; and additional prior proceedings including Index Nos. 806407/2021 (dismissed with prejudice) and 803580/2022. The cumulative filing of at minimum five separate state court proceedings against Plaintiff, across multiple courts, spanning five years, constitutes a pattern of judicial harassment that is independently actionable under the Fair Housing Act as a sustained effort to make Plaintiff's dwelling unavailable to her through legal process motivated by racial animus.

35K-1. ECKERT'S FRAUDULENT FOIL REQUEST — FALSE VICTIM CLAIM TO OBTAIN BODYCAM FOOTAGE OF PLAINTIFF WHILE FEDERAL LITIGATION WAS ACTIVE. On February 13, 2026 — while Plaintiff's federal civil rights case No. 1:21-cv-00449 was actively pending — Eckert submitted a FOIL request to the Buffalo Police Department, FOIL Request No. 25-335, Case ID 1001988251, using her email address reck0625@outlook.com, seeking the full body camera footage from officers called to 281 Barnard Street — Plaintiff's home — on February 12, 2026, at approximately 10:05 a.m. In that request, Eckert wrote the following: "I am the victim in the matter and I am entitled to a copy of the video footage pursuant to NYS Public Officers Law. This video is evidence for the victim in a civil matter and she is entitled to the footage by statutory law." This statement is false in every material respect. It was Plaintiff Carolette Meadows — not Eckert — who called police to 281 Barnard Street on February 12, 2026. Plaintiff was the reporting party and the complainant. Eckert was the subject of Plaintiff's complaint. Eckert was not present at Plaintiff's home as a victim. Eckert's written assertion that she was "the victim in the matter" was a deliberate material falsehood submitted to a public agency to obtain surveillance footage of a non-consenting person on private property. New York's Public Officers Law — the statute Eckert invoked — does not create a special entitlement for self-declared crime victims to obtain bodycam footage over the privacy interests of the person actually depicted in the footage. The statutory basis Eckert cited does not exist. Eckert's FOIL request was closed and fulfilled by BPD FOIL Officer Michelle Long on March 7, 2026 — 22 days after submission — with the notation "all records have been released." BPD released footage of Plaintiff on her own private property to Plaintiff's active litigation adversary, based on a false victim claim, without notifying Plaintiff, without giving Plaintiff any opportunity to object, without conducting any apparent

privacy analysis, and without verifying the incident report that would have shown Eckert was not the victim or complainant in the February 12 incident. Eckert's own written statement confirms she knew exactly what she was doing: she stated explicitly that "this video is evidence for the victim in a civil matter," confirming she was obtaining litigation evidence about Plaintiff through a government agency by making a false sworn claim, at a time when federal civil rights litigation between these same parties was actively pending before the Honorable Lawrence J. Vilardo. This conduct constitutes: (a) a false instrument filing under New York Penal Law § 175.30; (b) civil fraud and fraudulent misrepresentation under New York common law; (c) an additional overt act in furtherance of the § 1985(3) conspiracy to use governmental processes to gather intelligence about Plaintiff in furtherance of the racial harassment campaign; (d) a due process violation by BPD in releasing footage of a private person on private property without notice, without privacy analysis, and without verifying the requester's claimed status; and (e) a discovery abuse issue warranting sanctions in the federal proceedings under Fed. R. Civ. P. 11 and 26(g), as Eckert obtained litigation evidence through a fraudulent government filing while federal discovery rules governed the parties' conduct. See Exhibit WW — FOIL Request No. 25-335, Case ID 1001988251, showing Eckert's false victim claim, the date received February 13, 2026, and Michelle Long's March 7, 2026 release of all records.

35L. THE FOURTH DEPARTMENT'S 2023 RULING IN MEADOWS V. ECKERT — BINDING JUDICIAL FINDING THAT ECKERT'S CAMERAS WERE UNLAWFUL HARASSMENT. On July 28, 2023, the New York State Supreme Court Appellate Division, Fourth Department, issued its decision in Meadows v. Eckert, 2023 NY Slip Op 04065 (4th Dept 2023) (Whalen, P.J., Peradotto, Lindley, and Greenwood, JJ.), in which Plaintiff Carolette Meadows was the Plaintiff-Respondent and Rachel Eckert was the Defendant-Appellant. The case arose from Plaintiff's action against Eckert. The Fourth Department held as follows: (a) ECKERT'S CAMERAS CONSTITUTED UNLAWFUL HARASSMENT — BINDING JUDICIAL FINDING. The Fourth Department affirmed Judge Grisanti's order directing Eckert to reposition her security cameras because Plaintiff established that Eckert directed video imaging devices at Plaintiff's property without consent and with the intent to harass, annoy, or threaten Plaintiff under Civil Rights Law § 52-a. The Fourth Department further found that Plaintiff established Eckert uploaded video images of Plaintiff captured by those cameras to social media networks with no purpose but to harass, annoy, or threaten Plaintiff. This is a binding appellate judicial finding — not an allegation — that Eckert was conducting unlawful surveillance of Plaintiff and weaponizing that surveillance through social media harassment. This finding directly corroborates Plaintiff's Fair Housing Act and § 1985(3) claims in this federal action. (b) PLAINTIFF'S EASEMENT CLAIM OVER A STRIP OF ECKERT'S PROPERTY WAS REVERSED. The Fourth Department reversed Judge Grisanti's award of a permanent easement to Plaintiff over the 1¼ to 1¾ feet of the 8-foot concrete driveway area that extends onto Eckert's side of the property line. Plaintiff had sought this easement to use the full width of the driveway to access her garage. The court reversed on the grounds that Plaintiff did not submit

evidence of prior unity of title and did not establish absolute necessity, as she could park on the street. The court noted that vehicular access to the garage "may affect the value" of Plaintiff's home but is not "absolutely necessary" to reasonable use of her residence. (c) WHAT THIS RULING DOES NOT MEAN. The Fourth Department's reversal of the easement does not mean Eckert has any easement or right of access over Plaintiff's property. It means neither party has a court-ordered easement over the other's property. The central legal reality remains: Eckert has never held, and no court has ever granted her, any easement over Plaintiff's property. Every arrest BPD made premised on Eckert's claim that she had an easement authorizing workers' access to Plaintiff's property was therefore based on a claim that no court has ever validated — and that the Fourth Department has confirmed is legally unsupportable under Eckert's own theory of the case.

35M. THE FOURTH DEPARTMENT'S HARASSMENT FINDING DIRECTLY SUPPORTS THE FHA CLAIM. The Fourth Department's binding finding in Meadows v. Eckert that Eckert directed cameras at Plaintiff's property with intent to harass and uploaded the footage to social media with no purpose but to harass Plaintiff is not merely relevant background — it is a prior judicial determination on the merits that Eckert's surveillance and social media campaign against Plaintiff constituted unlawful harassment. Under the Fair Housing Act, 42 U.S.C. § 3617, it is unlawful to harass, coerce, or intimidate any person in the exercise of their right to enjoy their dwelling on account of race. The Fourth Department found — based on trial evidence — that Eckert's cameras and social media posts were directed at Plaintiff with no purpose but to harass. A federal court applying the FHA need not relitigate this question: a state appellate court has already made the factual finding of intentional harassment. That finding, combined with the racial context documented throughout this complaint — including Eckert's own court admission of intentional racial framing, her BANG podcast appearance, and her campaign against Black political figures — establishes that the harassment the Fourth Department found was racially motivated harassment within the meaning of the Fair Housing Act.

35N. WILLIAMSON v. MORGAN COUNTY, GEORGIA — PARALLEL PENDING FEDERAL CASE CONFIRMING THE NATIONAL PATTERN OF RACIALLY MOTIVATED PROPERTY DISPOSSESSION. The facts of this case are not unique. A parallel federal civil rights action currently pending in the United States District Court for the Middle District of Georgia, Williamson et al. v. Morgan County, Georgia et al., Case No. 3:2026cv00052, presents a nearly identical pattern of racially motivated property dispossession through the coordinated use of law enforcement and judicial actors against a Black property owner. In that case, Derrick Williamson, a Black man, held a valid deed to 40 acres of land in Morgan County, Georgia, built substantial improvements on that property, and was then subjected to a sustained campaign by a white family — assisted by a local judge — to strip him of his deed and remove him from his own land. Williamson was repeatedly arrested for being on property to which he held a legal deed — the precise constitutional injury Plaintiff has sustained across fifteen arrests in this case.

The local judge used a good behavior hearing as the vehicle to transfer Williamson's deed to the white family that wanted his land, repurposing a judicial proceeding as a mechanism of racially motivated property confiscation. Law enforcement repeatedly acted as the instrument of the white family's dispossession campaign rather than as the neutral enforcer of Williamson's documented property rights. The parallels to Plaintiff's situation are direct: a Black property owner holds documented legal rights to her home; a white neighbor asserts rights over that property that no court has ever validated; law enforcement accepts the white neighbor's claims without investigation while arresting the Black homeowner for exercising her lawful rights on her own property; and the courts are used as instruments of the dispossession campaign rather than as neutral arbiters. The pendency of a nearly identical federal civil rights action confirms that what happened to Plaintiff is not an aberration — it is a recognizable, documented national pattern of racially motivated property dispossession through law enforcement and judicial complicity that the Fair Housing Act, 42 U.S.C. §§ 3604, 3617, and 3631, and 42 U.S.C. §§ 1981, 1982, and 1985(3), were specifically enacted to address.

## TIMELINE OF EVENTS AND FACTUAL ALLEGATIONS

### A. Background and Prior Pattern (2020–May 2024)

36. Plaintiff has resided at 281 Barnard Street, Buffalo, NY 14202, for more than fifteen years. Defendant Eckert is her neighbor. Beginning no later than 2020, Eckert initiated a pattern of false police complaints against Plaintiff, each time falsely claiming that she held easement rights to Plaintiff's property under case index 805300/2020.

36A. THE 2020-2021 PATTERN — ORIGINS OF THE RACIALLY DISCRIMINATORY ENFORCEMENT. The constitutional violations in this complaint did not begin in 2024 or 2025. They are the continuation of a pattern of racially discriminatory law enforcement that began in March 2020 when Eckert first moved to 277 Barnard Street. The following documented facts from 2020-2021 establish the origin and consistency of BPD's and ECDA's unconstitutional custom of accepting Eckert's complaints without investigation while refusing, minimizing, or criminalizing Plaintiff's complaints: (a) OFFICER DIPASQUALE — MAY 23, 2020. After Eckert beat Plaintiff with a cast iron skillet from behind, putting Plaintiff in Sisters Hospital for two days with a concussion, collapsed lung, ear laceration, knee injury, and contusions, Officer DiPasquale told Plaintiff that Eckert was "protecting her property" and that he "would've done the same thing" to Plaintiff. DiPasquale viewed Plaintiff's survey showing the fence was on Plaintiff's property line but said Eckert's ownership claim was "newer and right." DiPasquale conditioned his agreement to charge Eckert with felony assault on Plaintiff also accepting a charge against herself. Officers DiPasquale and Nightingale initially declined to press charges

against Eckert; only Officer Dixon — the Black officer present — pushed for a felony assault charge. This incident alone establishes the racially discriminatory enforcement pattern: a white officer witnessed a felony assault against a Black disabled homeowner, said the white attacker was justified, and refused to charge her without also charging the victim.

36B. ADA SCHOEMICK — JULY 31, 2020 — THE RECORDED CONVERSATION. On July 31, 2020, Plaintiff went to Buffalo City Court to file the felony assault warrant card against Eckert. Plaintiff was called back to the court and informed that ADA John Schoemick had unilaterally reduced Eckert's charge from a police-issued felony to a misdemeanor. Plaintiff met with Schoemick. Plaintiff was recording this conversation. Schoemick told Plaintiff that "the police didn't do their job" and that because Eckert "wasn't arrested, the claim can't be that serious so take the misdemeanor or nothing at all." Schoemick made this determination without reviewing any evidence — not the hospital records documenting Plaintiff's concussion and collapsed lung, not the photographs, not the police bodycam footage. Schoemick's recorded statement that a felony assault that put a disabled Black woman in the hospital for two days with a collapsed lung "can't be that serious" because the white assailant was not arrested is among the most direct documented examples of racial bias in the ECDA's investigative-phase conduct. This recording constitutes evidence of the investigative-phase conduct for which Schoemick is entitled only to qualified immunity under Burns v. Reed, 500 U.S. 478 (1991). See Exhibit RR — Recording of Plaintiff's conversation with ADA Schoemick, July 31, 2020.

36C. DETECTIVE MCDERMOTT — ASYMMETRIC EVIDENCE STANDARDS. Detective McDermott applied a documented double standard in investigating complaints between Plaintiff and Eckert: (a) when Plaintiff provided video of Eckert pushing her, McDermott declined to charge Eckert, saying the video "wasn't clear"; (b) when Eckert claimed in July 2020 that Plaintiff stole a grill and tools worth hundreds of dollars, McDermott issued Eckert a warrant card against Plaintiff despite Eckert having no video evidence of theft, despite Eckert having two cameras on her home that would have captured any theft. McDermott demanded proof from Plaintiff but accepted Eckert's word without inquiry. This asymmetric application of evidentiary standards based on the race of the complainant establishes McDermott's individual liability and contributes to the BPD Monell custom of willful non-investigation of white complainants' credibility.

36D. GRAMAGLIA — DIRECT NOTICE AND NON-RESPONSE. In December 2020, Plaintiff located Deputy Commissioner Gramaglia's email address and contacted him directly seeking his assistance with BPD's discriminatory handling of her complaints. Gramaglia acknowledged contact and said he would contact Chief Joyce of A-District. Chief Joyce never contacted Plaintiff. Plaintiff then contacted Gramaglia directly on the following specific dates seeking follow-up: January 5, 6, 7, 11, and 19, 2021; February 23, 24, and 25, 2021; and March

1, 8, 12, 16, and 18, 2021 — thirteen separate contacts over a four-month period. Gramaglia did not respond to any of them. A supervisory official who receives thirteen direct communications over four months documenting a pattern of racial discrimination by his officers and responds to none of them has not merely failed to supervise — he has made a deliberate choice to ratify the conduct of his subordinates. City of St. Louis v. Praprotnik, 485 U.S. 112 (1988). Gramaglia's documented non-response to Plaintiff's specific, dated communications constitutes the clearest possible evidence of supervisory deliberate indifference.

36E-1. THE ARTICLE 78 — FORCED TO SUE A CHIEF JUDGE FOR THE RIGHT TO PROSECUTE HER OWN ATTACKER. By April 23, 2021, Plaintiff had been systematically denied access to every available channel of legal recourse for over a year: BPD officers had refused her complaints, minimized her reports, and issued warrant cards against her while declining to charge Eckert; ADA Schoemick had reduced Eckert's felony assault charge without reviewing any evidence; ADA Gordon had told Plaintiff to be more "courteous" if she wanted to be deemed credible and had not responded to her documentation; DA Flynn had ignored Plaintiff's repeated contacts throughout 2020 and 2021; and Deputy Commissioner Gramaglia had not responded to thirteen direct communications. Having exhausted every normal channel of justice, Plaintiff filed an Article 78 special proceeding in New York State Supreme Court on or about April 23, 2021, naming as respondents: (1) the Buffalo Police Department; (2) Craig Hannah, Chief Judge of Buffalo City Court; (3) Buffalo City Court; (4) Erika Webb, Buffalo City Court Clerk; and (5) the New York State Attorney General. The Article 78 sought a court order authorizing Plaintiff to exercise the right of private prosecution against Eckert — meaning Plaintiff was so completely blocked from obtaining justice through every governmental channel that she was forced to petition a court for the right to prosecute her own attacker herself. The Article 78 was denied. The denial of Plaintiff's Article 78 — combined with the year of documented refusals, reductions, and non-responses that preceded it — constitutes the complete breakdown of equal access to justice that the First and Fourteenth Amendments prohibit. By April 2021, Plaintiff had been denied: the right to have her complaints investigated equally; the right to have her attacker charged with a felony reflecting the actual severity of her injuries; the right to a supervisory response to documented discrimination; and now the right to prosecute her own case when all other avenues had been closed. The New York Attorney General, named as a respondent, had formal notice by April 2021 that a Black disabled homeowner in Buffalo was being denied equal access to legal process through racial discrimination by BPD and the ECDA. The AG took no action. See Exhibit VV — Article 78 Petition and Order of Denial.

Exhibit WW — FOIL Request No. 25-335, Case ID 1001988251, submitted by Rachel Eckert to the Buffalo Police Department on February 13, 2026, containing Eckert's false written claim that she was "the victim in the matter" regarding a call to 281 Barnard Street on February 12, 2026; Eckert's false invocation of New York Public Officers Law as statutory basis for her entitlement to the footage; Eckert's written acknowledgment that the footage was sought as "evidence for the

victim in a civil matter," confirming she was deliberately obtaining litigation evidence through a fraudulent government filing while federal civil rights litigation was pending; and BPD FOIL Officer Michelle Long's March 7, 2026 release notation stating "all records have been released and your request has been fulfilled" (disposition: false instrument filing under N.Y. Penal Law § 175.30; civil fraud; overt act in § 1985(3) conspiracy; Monell evidence of BPD's custom of accepting Eckert's claims without verification; due process violation for release of private footage without notice or privacy analysis; discovery abuse warranting sanctions under Fed. R. Civ. P. 11 and 26(g))

36E. ECKERT'S RAP SHEET — IN THE ECDA'S OWN FILE. When Plaintiff FOILed Eckert's prosecution file, she discovered that the ECDA's file on Eckert contained a RAP sheet showing: two prior assault charges, trespass, harassment, telephone harassment, larceny, and endangering a child — with no dispositions or complaint documents included in the file. The same ECDA that pursued Plaintiff across fifteen arrests with zero convictions was handling the prosecution of a complainant whose own RAP sheet showed a history of assault, larceny, and endangering a child. The ECDA's decision to accept Eckert's complaints without scrutiny while aggressively pursuing Plaintiff cannot be explained by any neutral prosecutorial principle — it can only be explained by the racial double standard that runs through every aspect of this case.

36F. THE MAY 2, 2022 INCIDENT — ECKERT VIOLATES ORDER OF PROTECTION, SON CHOKES PLAINTIFF, DA ADDS CHARGES AGAINST PLAINTIFF. On May 2, 2022, Eckert violated her own order of protection by screaming at Plaintiff that she was a child molester, provoking a confrontation. During the confrontation, Eckert's son placed Plaintiff in a chokehold while telling Eckert "get her." Despite Eckert violating her own order of protection and her son physically choking Plaintiff, the DA added an assault charge against Plaintiff even though Eckert sustained no injuries. The ECDA had previously reduced Eckert's felony assault charge — for an attack that put Plaintiff in the hospital with a collapsed lung — to a misdemeanor. The same ECDA then added an assault charge against Plaintiff for a confrontation in which Plaintiff was choked and Eckert was uninjured. This asymmetry — charges reduced for Eckert's hospitalization-causing assault, charges added for Plaintiff's response to being choked — is the racial double standard operating in its most direct and documented form.

36G. THE DOG SURRENDER — CHARGED WITH THEFT FOR FOLLOWING CITY POLICY. In December 2020, Plaintiff found a loose dog on her property, did not know it was Eckert's dog, and surrendered it to the City of Buffalo Animal Shelter per city policy for found animals. When Plaintiff arrived home, police were present and questioned her. Plaintiff explained the situation. In March 2021, Plaintiff received a summons from Judge Savage to appear in court for dog theft — with the accusatory document stating Plaintiff "coaxed the dog" with the "intent to deny" Eckert her dog. The ECDA prosecuted Plaintiff for following city policy for handling

lost animals found on her property. This prosecution, like every other in this case, was initiated by Eckert without investigation and pursued by the ECDA without any inquiry into whether Plaintiff's conduct was criminal.

36H. ECKERT'S STATED INTENT TO TAKE PLAINTIFF'S HOME. During the period covered by the 2021 federal complaint, Eckert made social media posts stating "who wants to be my Eckert? I'm going to own her house!" after Plaintiff missed a small claims court date and Eckert obtained a default judgment. Eckert also declared she "would not stop" and would "destroy her (Meadows) whole life." These public statements, made during the same period Eckert was filing police complaints and civil lawsuits against Plaintiff, establish that Eckert's goal from the beginning of this dispute has been to drive Plaintiff from her home — the precise FHA violation that the entire pattern of conduct has been designed to accomplish.

36I. ADA RYAN EMMERLING — "LET HER PROVE IT AT TRIAL." During a motion hearing, after Plaintiff informed the ECDA that BPD and the DA had ignored her property survey that cleared her of the underlying property charge, ADA Ryan Emmerling refused to withdraw the charge and instead stated "let her prove it at trial." This statement — made in response to Plaintiff presenting documentary evidence of her innocence — constitutes deliberate indifference to exculpatory evidence in the ECDA's possession and is independently actionable as malicious prosecution under Thompson v. Clark, 596 U.S. 36 (2022). Emmerling's refusal to investigate the survey Plaintiff provided, combined with his direction that Plaintiff prove her innocence at trial on a charge that her own documentation refuted, demonstrates the ECDA's institutionalized practice of maintaining prosecutions despite exculpatory evidence.

37. In a prior appearance in Buffalo City Court before Judge Keane (retired, and distinct from DA Michael Keane — they are brothers), Judge Keane characterized Eckert's claims as "dubious," providing early judicial recognition of Eckert's pattern of misrepresentation.

38. Prior to the events described herein, Plaintiff had been wrongfully arrested fourteen (14) times without a single conviction.

**B. May 2024 Arrest and Dismissal by Judge Wilson**

39. In or about May 2024, Plaintiff was arrested for "violating a court order" based on Eckert's false claim that she had an easement over Plaintiff's property under case 805300/2020.

40. BPD officers refused to credit Plaintiff's statement that she — not Eckert — held the easement, and arrested Plaintiff without proper investigation.

41. In or about July 2024, Judge Wilson of Buffalo City Court dismissed the charges and directed the parties that because case 805300/2020 did not clearly establish easement rights for Eckert, the matter was civil in nature and needed to return to Judge Grisanti for clarification.

42. Rather than complying with Judge Wilson's directive, Eckert, BPD, and the ECDA waited for a strategic opportunity to re-arrest Plaintiff before a different judge.

## C. The October 11, 2025 Arrest — Orchestrated Misconduct

43. Defendants Eckert, BPD officers, and the ECDA, acting in concert, waited until Defendant Diane Wray was assigned to Special Term in October 2025 — with full knowledge that Wray had previously had to recuse herself from prior proceedings involving Plaintiff and had made statements from the bench that suggested pre-judgment of Plaintiff's guilt, including telling Plaintiff, "you better stop messing with your neighbor."

44. Defendants also knew that Wray had aged out of her judicial seat and was being compelled to retire in December 2025 — rendering her effectively insulated from professional consequences for judicial misconduct.

45. On or about October 11, 2025, Eckert arranged for workers to bring all of their equipment onto Plaintiff's property, while Eckert's own car and her son's car remained parked in their driveway and in front of their house — demonstrating that there was no necessity for the workers to use Plaintiff's land.

43A. NO COURT HAS EVER GRANTED ECKERT AN EASEMENT OVER PLAINTIFF'S PROPERTY. The central claim Eckert made to BPD to justify workers' access to Plaintiff's property on October 11, 2025 — that she held an easement giving her the right to use Plaintiff's driveway — has never been validated by any court. Eckert has never been granted an easement over Plaintiff's property by any judge in any proceeding. The underlying civil case 805300/2020 established the opposite: it was Plaintiff, not Eckert, who had access rights at issue. The Fourth Department's 2023 ruling in Meadows v. Eckert confirmed that no easement exists in Eckert's favor over Plaintiff's property and that Eckert's cameras surveilling Plaintiff constituted unlawful harassment. BPD officers who arrested Plaintiff in October 2025 on Eckert's easement complaint therefore arrested her on a claim that has never been legally validated in over five years of

litigation — a claim that Judge Wilson had already characterized as civil rather than criminal, and that the Fourth Department had already addressed in the context of finding Eckert's conduct toward Plaintiff was harassment. This is not a failure to investigate. It is the deliberate elevation of an unvalidated white neighbor's claim over a Black homeowner's documented property rights.

46. Plaintiff repeatedly requested that the workers leave her property. Instead of complying, the workers and Eckert verbally berated Plaintiff while livestreaming on Facebook.

47. Plaintiff called 911. After approximately twenty (20) minutes of sustained verbal abuse — during which Plaintiff was called "Bitch" numerous times and was called a racial slur by one of the workers — Plaintiff retrieved a lawfully owned 12-gauge shotgun from her home, brought it out unloaded, and instructed everyone to leave her driveway.

48. BPD responded within three (3) minutes of receiving calls about a gun — a response time sharply contrasting with its prior disregard for Plaintiff's calls regarding trespass. At the scene, no one displayed signs of fear or distress; individuals were laughing, continuing to record Facebook Live videos, and calling Plaintiff "bitch." Eckert herself was not in the driveway and was not in the path or direction of the weapon.

49. Defendant Officer Prana generated an arrest report for Plaintiff on a charge of menacing, deliberately writing the complaint so as to create artificial uncertainty about whether Plaintiff was standing on her own property — when Plaintiff was standing adjacent to her own home.

50. Upon arrival at A-District, BPD arresting officers told Plaintiff she was being held downtown for violating a restraining order. Plaintiff denied any such order existed and asked for it to be produced. Officers stated it was "too late" and she was being held.

## D. Unlawful Detention and Physical Abuse at Buffalo City Jail

51. Upon admission to the holding cells, Plaintiff reiterated to Lt. John Doe that there was no restraining order. The Lt. claimed he had "seen it" but refused to produce it.

52. Plaintiff requested a medical run because she had not taken her lupus medications and pain medications.

53. Lt. John Doe refused to grant Plaintiff a medical run.

54. Plaintiff, in a state of acute medical and emotional distress, attempted to harm herself in her cell.

55. Jail staff — Lt. John Doe, John Doe 1, John Doe 2, Jane Doe 1, and Jane Doe 2 — entered Plaintiff's cell, restrained her, and began placing her in a restraint chair.

56. While being placed in the chair, John Doe 1 inserted his fingers into Plaintiff's nose and shoved Plaintiff's septum into her head. Plaintiff cried out in pain. When Lt. John Doe looked up, John Doe 1 ceased the conduct temporarily.

57. When the Lt. looked away again, John Doe 1 then placed his hand around Plaintiff's trachea in a C-clamp grip, cutting off Plaintiff's ability to breathe. Plaintiff gasped, causing the Lt. to look up again, at which point John Doe 1 released her throat.

58. John Doe 1 then tightened the shoulder strap on Plaintiff's left shoulder so severely that Plaintiff's shoulder was visibly lifted from the tension. Plaintiff repeatedly told all staff that the strap was too tight. Staff laughed at her complaints.

59. Plaintiff was placed in a restraint room with the chair handcuffed to a pole. She continuously reported losing circulation in her hand, experiencing pins and needles, and warned staff she would suffer permanent nerve damage. Staff audibly laughed each time she complained.

60. Plaintiff turned her hands toward the camera to show staff that her hands had turned purple. Staff continued to laugh.

61. The strap began to embed into Plaintiff's arm. The pain became so intense that Plaintiff attempted to chew through the strap.

62. After an extended period, Lt. John Doe returned and asked Plaintiff if she was "ready to behave." Plaintiff reiterated her demand to go to the hospital. Lt. John Doe threatened to leave her in the chair. Plaintiff responded that she would go to the hospital regardless and that the staff had now injured her.

63. Lt. John Doe then ordered staff to call an ambulance and remove Plaintiff from the chair. When Jane Doe 1 and Jane Doe 2 attempted to remove the shoulder strap, they found it so deeply

embedded that Plaintiff screamed at the lightest touch and ultimately had to instruct staff to quickly pull the strap free.

64. When EMS arrived at the jail, they attempted to dissuade Plaintiff from going to the hospital and told the triage nurse at ECMC that Plaintiff was "just there for meds." Plaintiff corrected this false statement and insisted she had been physically injured by jail staff.

65. The triage nurse, upon Plaintiff's declaration of injury, directed that Plaintiff be admitted. The treating physician at ECMC diagnosed Plaintiff with complications resulting from the over-tightness of the restraint straps and kept Plaintiff for several hours of observation due to additional medical complications.

66. On March 26, 2025, specialized testing confirmed that Plaintiff sustained a permanent injury to her left arm as a result of the improper application of restraints at Buffalo City Jail. (See Exhibit — Medical Test Results)

## E. Arraignment — Judicial Misconduct by Defendant Wray

67. Plaintiff was returned to jail at approximately 3:00 a.m. and attended arraignment at 8:00 a.m. before Defendant Diane Wray.

68. When Plaintiff asked to be unshackled so she could read the charging documents and participate in her own defense, Wray yelled, "NO, you can't be uncuffed and you're not going to be pro se!" and demanded a public defender approach Plaintiff against Plaintiff's express wishes.

69. The public defender, aware that Plaintiff wished to proceed pro se, did not show Plaintiff the charging documents.

70. Wray then ordered Plaintiff to state that she would allow the workers on her property. When Plaintiff refused to surrender her property rights, Wray stated: "you better tell me you understand that they're gonna use your property or I'll leave you in jail for a week and let them do it while you sit there!" This statement constitutes a judicial order compelling the unconstitutional taking of private property without due process.

71. Plaintiff was released following the intervention of attorney Frank Pratcher, who appeared as a favor and expressed that Wray's hostility toward Plaintiff was "obvious."

72. In transporting Plaintiff to A-District prior to arraignment, Lt. Danner placed Plaintiff in a patrol car with windows closed and no ventilation for an extended period, causing heat distress that exacerbated Plaintiff's asthma. Plaintiff's distress was ignored until she began attempting to kick out the windows.

## F. Property Rights Violated — BPD Grants Third Party Access to Plaintiff's Land

73. While Plaintiff was detained, BPD officers — at the direction of Detective Folts, overruling the prior instruction of Lt. Danner — permitted Eckert's workers to use Plaintiff's property and complete the work. Lt. Danner later confirmed to Plaintiff by telephone that "Det. Folts overruled me and told them to do the work."

74. Detective Folts, when contacted by Plaintiff about this violation of her property rights, stated: "I have nothing to say because you're only going to sue me." This statement constitutes an admission of awareness of wrongdoing.

75. BPD officers also seized Plaintiff's two firearms and all ammunition without issuing a property receipt, in violation of standard law enforcement protocols and Plaintiff's Fourth Amendment rights.

## G. The Eleven-Month Malicious Prosecution

76. Rather than promptly dismissing charges that it knew were deficient — including charges where the complaining witness (Eckert) was not a viable victim because she was not present in the driveway or in the path of the weapon — the ECDA under DA Keane pursued prosecution of Plaintiff for nearly one year.

77. During this period, the ECDA repeatedly attempted to coerce Plaintiff into accepting an Adjournment in Contemplation of Dismissal (ACD) on what was, in essence, a menacing charge related to Plaintiff's lawful possession of a firearm on her own property.

78. When Plaintiff's first public defender, Warren Griffiths, was actively pursuing a motion to dismiss, he was removed from the case on March 9, 2025, and replaced by Karla Zimmerman of the Legal Aid Bureau. Plaintiff alleges this removal was orchestrated to derail the pending motion.

79. Zimmerman ignored Plaintiff's requests to meet, filed motions without Plaintiff's review including a factually erroneous motion to dismiss that had to be withdrawn, looked to the DA for guidance during proceedings, and ultimately attempted to force Plaintiff to accept a plea by declaring: "I'm a trained attorney, you are not, and if you don't want to take my advice then maybe you should be pro se again!"

80. Zimmerman was ultimately removed following an altercation in the courthouse hallway and courtroom. Legal Aid Bureau then "conflicted off" Plaintiff's case, allowing her to obtain counsel through Assigned Counsel.

81. Plaintiff's Assigned Counsel attorney, Mrs. Price, upon reviewing the case, concluded Plaintiff had committed no crime. She prepared both a CPL § 30.30 motion and a motion on the merits, met with the DA, demonstrated that Eckert was not a viable victim because she was never in the driveway with the workers or the weapon, and informed the ECDA that it could not prevail at trial.

82. On June 9, 2025 — nearly eight months after Plaintiff's arrest — the ECDA agreed not to contest the 30.30 motion, and charges were dismissed. This outcome confirms that the prosecution was never legally tenable and was maintained for retaliatory purposes.

## H. Continued Obstruction After Dismissal — Weapons Retention

83. After dismissal, Plaintiff sought to retrieve her seized firearms. BPD refused to return them without an appointment, did not return calls, required additional paperwork, and ultimately required a court order even after Plaintiff submitted all required forms and the vacated restraining order.

84. On July 1, 2025, Plaintiff obtained a court order from Judge Feroleto directing return of her property. On July 7, 2025, when Plaintiff arrived at BPD Headquarters at her scheduled appointment, BPD called her minutes before arrival to report a "coding error" meant her guns could not be located.

85. Plaintiff filed an Internal Affairs complaint. Only after this complaint were Plaintiff's firearms and all supplies returned to her on July 10, 2025.

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

## I. ADA Violations at the Erie County District Attorney's Office

86. On February 11, 2025, Plaintiff attended a meeting at the ECDA's office with her then-attorney Warren Griffiths. There were no chairs available in the hallway and the receptionist was unable to provide any.

87. Erie County investigators (John Doe 1 and John Doe 2 — ECI) and ECDA Jane Doe repeatedly denied Plaintiff's requests for a chair, even after Plaintiff explained she had a bad back. John Doe ECI 1 stated: "you aren't that disabled. You walked here, right?" Plaintiff, unable to stand comfortably, was reduced to sitting on a decorative artificial plant to manage her pain.

88. When Plaintiff asked for the name of Erie County's ADA Compliance Officer, all three county officials ignored her question.

89. Plaintiff subsequently filed a FOIL request for hallway video. The FOIL was denied with a claim that no video existed. Plaintiff later independently located Erie County's ADA Compliance Officer, who confirmed that county staff are trained to provide chairs to anyone who requests them.

90. Plaintiff filed a complaint with the NYS Department of Human Rights (NYSDHR), which was declined. See Exhibit H.

## J. Retaliatory Property Violations

91. On March 11, 2025 — shortly after Plaintiff filed ADA complaints and other civil rights grievances against the ECDA — the trust that holds the property occupied by Plaintiff received citations for items that do not constitute legitimate violations. Plaintiff alleges these citations were issued in retaliation for Plaintiff's complaints.

## K. Court Clerk Obstruction of Transcripts

92. In January 2025, Plaintiff's then-attorney Warren Griffiths requested transcripts from Plaintiff's July 2024 appearance before Judge Wilson from the Buffalo City Court Clerk's office. The Clerk refused to provide the transcripts. (See Exhibit E.)

93. Plaintiff was compelled to send a written threat that she would subpoena Judge Wilson for testimony if transcripts were not produced. (See Exhibit F.) Transcripts were finally obtained on March 8, 2025.

## CAUSES OF ACTION

### COUNT I — EXCESSIVE FORCE AND UNLAWFUL SEIZURE

42 U.S.C. § 1983; 42 U.S.C. §§ 3617, 3631; 18 U.S.C. § 242

Fourth and Fourteenth Amendments; Takings Clause (Fifth Amendment)

Defendants: BPD, BPD Officers and Detectives, City of Buffalo, City of Buffalo Jail Staff, Wray

94. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

95. BPD officers and detectives, acting under color of law, willfully made false assertions that Plaintiff had violated a restraining order, used that false claim to incarcerate Plaintiff, and in doing so acted with deliberate indifference to Plaintiff's civil rights.

95A. WILLFUL FAILURE TO INVESTIGATE BEFORE ARREST — BPD. BPD officers, prior to arresting Plaintiff on October 11, 2025, were in possession of the following information, each of which a reasonable officer would have investigated before effectuating an arrest: (a) Plaintiff's statement that she — not Eckert — held the easement under case 805300/2020; (b) the fact that Lt. Danner had looked up and confirmed the existence of the May 2024 arrest on the same underlying dispute; (c) the fact that the May 2024 charge had been dismissed by Judge Wilson with a directive that the matter was civil in nature; (d) Plaintiff's statement that no restraining order existed; (e) the Facebook Live video already in circulation at the scene showing Eckert was not in the driveway and not in the path of the weapon; and (f) the Fourth Department's binding 2023 ruling in Meadows v. Eckert confirming that Eckert's cameras surveilling Plaintiff constituted unlawful harassment and that no court has ever granted Eckert an easement over Plaintiff's property, a ruling publicly available in the NYSCEF electronic filing system and within the constructive knowledge of every BPD officer responding to an easement-related complaint. BPD officers deliberately declined to investigate any of this information. The failure to investigate readily available exculpatory information before making an arrest negates probable cause and constitutes an unreasonable seizure under the Fourth Amendment. This willful non-investigation was not an error in judgment — it was a deliberate choice to accept a white complainant's allegations without scrutiny while ignoring a Black homeowner's contrary evidence and legal rights.

95B. WILLFUL IGNORANCE OF PRIOR JUDICIAL FINDINGS. Lt. Danner affirmatively looked up the May 2024 arrest in BPD's system before arresting Plaintiff in October 2025. He therefore had actual knowledge that the prior charge arose from the same underlying dispute and had been dismissed. Despite possessing this information, Lt. Danner arrested Plaintiff again without making any inquiry into the outcome or legal significance of the prior dismissal. Detective Folts, who subsequently overruled Lt. Danner's instruction to keep workers off Plaintiff's property, similarly had access to the prior case history and deliberately disregarded it. A law enforcement officer who has exculpatory information in hand and deliberately declines to consider it before making an arrest is not acting in good faith — he is acting with willful blindness that strips any claim of qualified immunity. Pearson v. Callahan, 555 U.S. 223 (2009); Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010) (officers who ignore evidence of innocence cannot claim good-faith probable cause).

95C. FRANKS V. DELAWARE — DELIBERATELY MISLEADING ARREST COMPLAINT. Officer Prana's deliberate drafting of the October 2025 arrest complaint to create artificial uncertainty about whether Plaintiff was standing on her own property violates Franks v. Delaware, 438 U.S. 154 (1978), which holds that a Fourth Amendment violation occurs when an officer deliberately or recklessly includes false statements in — or omits material facts from — an arrest affidavit. Officer Prana deliberately: (a) omitted the July 2024 Wilson dismissal and civil directive on the identical underlying conduct; (b) omitted that Lt. Danner had verified the prior arrest in real time at the scene; (c) framed Plaintiff's presence on her own property as uncertain when he knew she was standing adjacent to her home; and (d) omitted Eckert's own Facebook Live video showing Eckert was not in the driveway or path of the weapon. Inclusion of any one of these facts would have eliminated probable cause. A complaint that deliberately omits material exculpatory facts is the functional equivalent of a false affidavit under Franks, and the resulting arrest violates the Fourth Amendment regardless of what the complaint states on its face.

95D. QUALIFIED IMMUNITY CANNOT SHIELD THE BPD OFFICER DEFENDANTS. Qualified immunity protects government officials from civil liability only where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Pearson v. Callahan, 555 U.S. 223, 231 (2009). Each BPD officer defendant is individually liable because the rights they violated were clearly established at the time of their conduct: (a) OFFICER PRANA — It was clearly established at the time of the October 2025 complaint that deliberately omitting material exculpatory facts from an arrest affidavit violates the Fourth Amendment. Franks v. Delaware, 438 U.S. 154 (1978); Manganiello v. City of New York, 612 F.3d 149, 161 (2d Cir. 2010) ("an officer who deliberately withholds exculpatory evidence or fabricates evidence is not entitled to qualified immunity"). No reasonable officer in 2025 could have believed that drafting a complaint designed to obscure a homeowner's presence

on her own property — while knowing the prior charge on the same conduct had been dismissed — was constitutionally permissible. (b) DETECTIVE FOLTS — It was clearly established that a law enforcement officer may not grant a private third party access to another person's private property without legal authority, consent, or exigent circumstances. The right to be free from unreasonable seizure of property under the Fourth Amendment was clearly established. Additionally, Folts' own statement — "I have nothing to say because you're only going to sue me" — demonstrates his subjective awareness that his conduct was unlawful, which defeats any qualified immunity defense as a matter of law. (c) LT. DANNER — It was clearly established that confining a non-resisting arrestee in a sealed vehicle without ventilation in conditions causing heat stress and respiratory distress constitutes excessive force under Graham v. Connor, 490 U.S. 386 (1989). The right to be free from environmental excessive force was clearly established in this Circuit. (d) OFFICERS PRANA, SULLIVAN, GARRY, MELLIGAN, MACIEJEWSKI, MORIARTY, AND LARUSCH — It was clearly established that arresting a person without probable cause violates the Fourth Amendment, and that officers who possess information establishing the absence of probable cause may not claim qualified immunity. Zalaski v. City of Hartford, 723 F.3d 382, 390 (2d Cir. 2013). Each officer present at the October 2025 scene had access to the same information — the prior dismissal, Plaintiff's property rights, and Eckert's own video — that negated probable cause.

95E. DIPASQUALE AND MCDERMOTT — THEIR CONDUCT AS MONELL PATTERN EVIDENCE. Because Officer DiPasquale and Detective McDermott are defendants in the pending Case No. 1:21-cv-00449 rather than in this action, their individual qualified immunity analysis will be addressed in that proceeding upon consolidation. Their conduct is cited here as powerful Monell pattern evidence establishing BPD's unconstitutional custom: DiPasquale's statement that he "would've done the same thing" as Eckert in assaulting a disabled Black homeowner, and McDermott's application of different evidentiary standards to white and Black complainants, demonstrate the racial double standard that BPD supervisors including Gramaglia and Wright failed to correct despite actual notice. These acts establish the Monell custom of racially discriminatory law enforcement that is at the core of Plaintiff's claims against the City of Buffalo.

96. BPD officers and detectives usurped Plaintiff's property rights and unlawfully granted Eckert's workers access to Plaintiff's land while Plaintiff was wrongfully detained — all without due process or just compensation, in violation of the Takings Clause.

96A. DETECTIVE FOLTS — WILLFUL IGNORANCE OF PROPERTY RIGHTS. Detective Folts overruled Lt. Danner and directed Eckert's workers to proceed on Plaintiff's property while Plaintiff was in custody. Folts did so with actual knowledge that: (a) Lt. Danner had already

instructed workers to stay off Plaintiff's property pending court resolution; (b) Plaintiff had been arrested and her charges previously dismissed on the same underlying property dispute; and (c) the court order at issue did not establish Eckert's easement. Rather than investigate these facts before acting, Folts deliberately chose to look away and grant third-party access to Plaintiff's land without review of any legal authority to do so. His statement — "I have nothing to say because you're only going to sue me" — constitutes direct evidence of awareness that his conduct was legally indefensible. An officer who knows his conduct is wrong and proceeds anyway — rather than investigating whether he has legal authority to act — is not acting in good faith. Folts' willful non-investigation of Plaintiff's property rights before granting third-party access to her land constitutes an unconstitutional taking without due process under the Fifth and Fourteenth Amendments.

97. BPD officers unlawfully seized Plaintiff's firearms without issuing a property receipt.

98. City of Buffalo jail staff applied excessive force through choking and the improper and punitive use of a restraint chair, causing Plaintiff to be hospitalized and to suffer permanent injury to her left arm as confirmed by testing on March 26, 2025.

98A. GRAHAM V. CONNOR — OBJECTIVE REASONABLENESS STANDARD. All excessive force claims under the Fourth and Fourteenth Amendments are evaluated under the objective reasonableness standard of Graham v. Connor, 490 U.S. 386 (1989), which requires courts to assess: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat; and (3) whether the suspect is actively resisting or attempting to evade. Applied to the jail restraint abuse: (1) Plaintiff was held on a misdemeanor; (2) Plaintiff was already fully secured in a restraint chair and posed zero threat; and (3) Plaintiff was stationary, restrained, and verbally demanding medical care — not resisting. Under these facts, no use of force was objectively reasonable. The choking, nasal assault, and embedding of a strap into Plaintiff's arm until it had to be forcibly torn free were objectively unreasonable under any standard and constitute excessive force in violation of the Fourteenth Amendment.

98B. GRAHAM V. CONNOR — HOT CAR AS ENVIRONMENTAL EXCESSIVE FORCE. Lt. Danner's act of confining Plaintiff in a sealed patrol vehicle with no ventilation for an extended period — while ignoring her screams and her documented asthma — constitutes a separate use of excessive force through environmental means. The deliberate use of dangerous environmental conditions to cause physical distress to a non-resisting detainee is cognizable as excessive force under Graham. The risk of heat stress from confinement in a closed vehicle is well-known to law enforcement. Ignoring Plaintiff's screams until she attempted to kick out the windows was objectively unreasonable and constitutes an independent excessive force claim against Lt. Danner and against the City of Buffalo under Monell.

98C. QUALIFIED IMMUNITY CANNOT SHIELD JAIL STAFF DEFENDANTS. The constitutional rights violated by jail staff defendants were clearly established at the time of the October 2025 abuse: (a) JOHN DOE 1 — It was clearly established that applying a chokehold to a non-resisting, fully restrained detainee violates the Fourteenth Amendment. Bellamy v. City of New York, 914 F.3d 727, 745 (2d Cir. 2019) (use of chokehold on compliant detainee was objectively unreasonable and violated clearly established law). It was similarly clearly established that deliberately inserting fingers into a detainee's nose to cause pain constitutes excessive force. No reasonable correctional officer in 2025 could have believed that choking and nasally assaulting a restrained, compliant detainee was constitutionally permissible. (b) JOHN DOE 1 — RESTRAINT CHAIR ABUSE. It was clearly established that over-tightening restraints to the point of causing a medically documented permanent nerve injury constitutes excessive force. Cugini v. City of New York, 941 F.3d 604, 612 (2d Cir. 2019) (use of restraints causing injury actionable under Fourteenth Amendment). The right to be free from physical injury caused by needlessly tight restraints was clearly established in this Circuit well before October 2025. (c) LT. JOHN DOE — DENIAL OF MEDICAL CARE. It was clearly established that deliberate indifference to a pretrial detainee's serious medical needs violates the Fourteenth Amendment. Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017). A lupus patient's need for daily medication is an objectively serious medical condition. Lt. John Doe's refusal to permit a medical run, without any inquiry into the nature of Plaintiff's medical needs, constitutes deliberate indifference under clearly established law. (d) ALL JAIL STAFF BYSTANDERS — It was clearly established under Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994), that an officer who has a realistic opportunity to intervene to prevent unconstitutional excessive force and fails to do so is individually liable. Every jail staff member who stood outside Plaintiff's cell door laughing while John Doe 1 assaulted her had a realistic opportunity to intervene and failed to do so. This Circuit's law on bystander liability was clearly established well before October 2025.

99. Defendant Wray, in ordering Plaintiff to remain shackled throughout arraignment without any individualized finding of necessity, violated clearly established constitutional law. Deck v. Missouri, 544 U.S. 622 (2005); United States v. Sanchez-Gomez, 859 F.3d 649 (9th Cir. 2017). Wray also violated the Fifth Amendment's Takings Clause by conditioning Plaintiff's release on Plaintiff's agreement to allow third-party use of her property.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Ten Million Dollars ($10,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT II — FAILURE TO INTERVENE

42 U.S.C. § 1983; 42 U.S.C. §§ 3617, 3631

Defendants: City of Buffalo, Jail Staff, BPD, BPD Officers

100. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

101. BPD officers failed to intervene to prevent Plaintiff's unlawful arrest notwithstanding her repeated, accurate assertion that no order of protection existed.

101A. WILLFUL FAILURE TO VERIFY THE RESTRAINING ORDER. When Plaintiff asserted that no restraining order existed, BPD officers and jail staff Lt. John Doe had the immediate means to verify her claim — by producing the alleged order from their own database. They refused. Lt. John Doe claimed he had "seen" the restraining order but declined to produce it when Plaintiff asked. This was not a failure of access — it was a deliberate choice not to verify information that was directly contestable and directly verifiable. An officer who detains a person on the basis of a restraining order he claims exists but refuses to produce when the detainee contests it is not acting on probable cause — he is engaged in willful blindness designed to sustain a detention he cannot legally justify. This willful refusal to verify a contested legal basis for detention constitutes an unreasonable seizure under the Fourth Amendment and a due process violation under the Fourteenth Amendment.

101B. WILLFUL FAILURE TO INVESTIGATE MEDICAL NEED. Jail staff were informed by Plaintiff that she had not taken her lupus and pain medications and required a medical run. Rather than inquiring into the nature or urgency of Plaintiff's medical need — a basic investigative step that her disability status made obviously necessary — Lt. John Doe flatly refused without any assessment. This willful failure to investigate a disabled detainee's medical necessity, in deliberate indifference to the known risk of serious harm from medication deprivation in a lupus patient, constitutes deliberate indifference to a serious medical need in violation of the Fourteenth Amendment. Darnell v. Pineiro, 849 F.3d 17 (2d Cir. 2017).

101C. BYSTANDER LIABILITY — ANDERSON V. BRANEN. Under Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994), a law enforcement officer who is present, observes a fellow officer's unconstitutional use of force, has a realistic opportunity to intervene, and fails to do so is independently liable for the resulting harm. Every jail staff member present during the restraint chair episode — Lt. John Doe, John Doe 1, John Doe 2, Jane Doe 1, and Jane Doe 2 — had a realistic and repeated opportunity to intervene to stop the nasal assault, the chokehold, and the over-tightening of the shoulder strap. Each heard Plaintiff cry out in pain. Each heard Plaintiff report losing circulation. Each heard staff laughing at Plaintiff's pleas. Each had the authority and the physical ability to stop the ongoing abuse at any moment and deliberately chose not to do

so. Under Anderson v. Branen, each such defendant is independently and personally liable for every act of excessive force they witnessed and failed to prevent.

102. City of Buffalo jail staff failed to intervene when Plaintiff declared there was no restraining order, when medical care was denied, and when John Doe 1 physically abused Plaintiff in the restraint chair. Lt. John Doe was present and witnessed or had reason to intervene in each episode of abuse.

103. BPD officers and COB Lt. John Doe failed to produce any order of protection despite Plaintiff's repeated demands.

104. All state actor Defendants acted contrary to the requirements of Cariol's Law, New York's law requiring officers to intervene in observed misconduct.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Three Million Dollars ($3,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT III — CONSPIRACY TO VIOLATE CIVIL RIGHTS

42 U.S.C. §§ 1983, 1985; Fair Housing Act §§ 3617, 3631; Title II ADA

All Defendants

105. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

106. The sheer number of coordinated acts by numerous state actors and private Defendant Eckert — including timed selection of a biased judge, orchestrated arrest, simultaneous denial of medical care and property rights, deliberate prosecution without a viable victim, removal of effective defense counsel, and post-dismissal obstruction of firearms return — establishes an agreement among two or more Defendants to deprive Plaintiff of her federally protected rights.

106A. OVERT ACTS IN FURTHERANCE OF THE § 1985(3) CONSPIRACY. Plaintiff specifically identifies the following overt acts committed by Defendant Eckert and state actor co-conspirators in furtherance of the racially motivated conspiracy to deprive Plaintiff of her rights: (1) ECKERT'S INITIATION: Defendant Eckert was the initiating actor in a scheme specifically designed to have Plaintiff removed from her home. Eckert explicitly stated in open court before Judge Ward that her goal was to obtain a judgment against Plaintiff large enough

that Plaintiff could not pay, so that the Erie County Sheriff could execute a forced sale of Plaintiff's home. This statement — made in court, on the record — is direct evidence of Eckert's specific intent to deprive Plaintiff of her home on account of race. (2) ADA RYAN EMMERLING'S DISTANCE ENFORCEMENT REQUESTS: ADA Ryan Emmerling, acting in coordination with Eckert's stated goal of removing Plaintiff from her home, made not one but two separate requests to two different judges to enforce the distance requirement of the restraining order in a manner that would have required Plaintiff to vacate her own home. This is legally indefensible. New York law is unambiguous that a criminal court order of protection may require a defendant to stay away from the protected person, but it cannot — and does not — require a defendant who is a homeowner to vacate their own residence absent a finding of domestic violence or a specific judicial determination of necessity, particularly for a non-violent misdemeanor. The attempt to use a distance requirement to constructively evict Plaintiff from her own home was a deliberate misuse of the order of protection mechanism in furtherance of Eckert's dispossession scheme. No legitimate prosecutorial purpose was served by attempting to remove a homeowner from her property on a menacing charge that the ECDA itself ultimately conceded was unproveable. (3) ECKERT'S RACIAL ADMISSION IN COURT: During trial proceedings in case number 805300/2020 before Judge Grisanti, Defendant Eckert admitted on the record that she intentionally misled the public by making the property dispute appear racial in nature when race was not the actual basis of the dispute. This admission is direct evidence of Eckert's racially motivated intent and constitutes a judicial admission of the racial animus required to establish a § 1985(3) private conspiracy claim under Griffin v. Breckenridge, 403 U.S. 88 (1971). These three overt acts — Eckert's explicit dispossession goal, the ECDA's ADA Ryan Emmerling making two improper distance-enforcement requests in furtherance of that goal, and Eckert's court admission of intentional racial misrepresentation — together establish the agreement, racial animus, and specific overt conduct required to sustain a § 1985(3) conspiracy claim against both Eckert and the ECDA actors who participated in furtherance of her scheme.


106B. THE WILLIAMSON CASE CONFIRMS THE § 1985(3) CONSPIRACY PATTERN. The pending federal case of Williamson et al. v. Morgan County, Georgia et al., No. 3:2026cv00052 (M.D. Ga. 2026), confirms that the racially motivated private conspiracy to dispossess a Black property owner through coordinated law enforcement and judicial actors is a recognized and actionable claim under 42 U.S.C. § 1985(3). In Williamson, as in the present case, the essential elements of a Griffin v. Breckenridge, 403 U.S. 88 (1971), conspiracy are fully present: two or more persons — a white private party and state and judicial actors — acting in concert, motivated by racial animus, to deprive a Black property owner of his constitutional rights through false police complaints, repeated arrests on his own land, fraudulent deed manipulation, and a judicial proceeding repurposed as a vehicle for property confiscation. In the present case, the conspirators used fifteen false police complaints, fifteen wrongful arrests, a biological weapon prosecution in which the DA withheld the victim's own video, multiple

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

fraudulent misrepresentations to courts, and the judicial conduct of Defendant Wray at arraignment to accomplish the same racially motivated dispossession goal that the Williamson conspirators pursued through different but legally equivalent means. The Williamson case demonstrates that what Plaintiff experienced is not a series of unrelated errors by individual actors — it is the operation of a nationally documented conspiracy whose architecture, methods, and racial motivation are consistent across jurisdictions.

106C. THE FRAUDULENT FOIL REQUEST AS OVERT ACT IN FURTHERANCE OF THE CONSPIRACY. Eckert's February 13, 2026 FOIL Request No. 25-335 constitutes an additional overt act in furtherance of the § 1985(3) conspiracy. The request was made while federal civil rights litigation was actively pending. Eckert submitted a written false statement to BPD — a state actor — falsely claiming victim status to obtain surveillance footage of Plaintiff on Plaintiff's own private property. BPD — through FOIL Officer Michelle Long — fulfilled the request without verification, without notice to Plaintiff, and without privacy analysis, thereby acting as the instrument of Eckert's intelligence-gathering operation against Plaintiff in active federal litigation. The coordination between Eckert's false claim and BPD's uncritical compliance is precisely the private-actor-plus-state-actor coordination that Griffin v. Breckenridge, 403 U.S. 88 (1971), identifies as the hallmark of a § 1985(3) conspiracy. Eckert provided the false predicate. BPD acted on it. Plaintiff bore the consequence — her private bodycam footage delivered to her active litigation adversary without her knowledge or consent.

107. Eckert participated in this conspiracy by coordinating the deployment of workers onto Plaintiff's property, filing fraudulent police complaints, and maintaining ongoing communication with law enforcement to further the unlawful arrest and detention of Plaintiff.

108. Erie County investigators and ECDA staff participated in this conspiracy through the ADA violations at the ECDA office and the subsequent retaliation against Plaintiff's property trust.

109. This conspiracy was motivated by racial and retaliatory animus.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Three Million Dollars ($3,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT IV — MALICIOUS PROSECUTION AND PROSECUTORIAL MISCONDUCT

42 U.S.C. §§ 1983, 3613; Fair Housing Act § 3617; Title II ADA

Defendants: John Flynn, Michael Keane, Erie County, ECDA, Wray

110. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

111. A claim of prosecutorial misconduct requires showing (1) misconduct and (2) prejudice. U.S. v. Caballero, 277 F.3d 1235, 1248 (10th Cir. 2002). Plaintiff satisfies both elements in full.

111A. BRADY AND GIGLIO VIOLATIONS — WITHHOLDING EXCULPATORY AND IMPEACHMENT EVIDENCE. Brady v. Maryland, 373 U.S. 83 (1963), requires the prosecution to disclose evidence favorable to the accused that is material to guilt or punishment. Giglio v. United States, 405 U.S. 150 (1972), extends this duty to evidence affecting witness credibility. The ECDA violated both Brady and Giglio throughout the nearly eleven-month prosecution by failing to disclose: (a) Eckert's Facebook Live video showing she was not in the driveway and not in the path of the weapon — establishing that the complaining witness was not a viable victim; (b) the July 2024 Wilson dismissal with civil directive — directly exculpatory as to the criminal nature of Plaintiff's conduct; (c) the prior judicial finding characterizing Eckert's claims as "dubious" — Giglio impeachment evidence of the highest order; (d) the complete record of fourteen prior failed prosecutions by the same complainant; and (e) the absence of any valid restraining order at the time of arrest. Each item was in the ECDA's possession, was favorable to Plaintiff, and was material. The ECDA's failure to disclose any of them constitutes Brady/Giglio violations independently actionable under 42 U.S.C. § 1983.

111B. HECK V. HUMPHREY PRESENTS NO BAR TO PLAINTIFF'S CLAIMS. Heck v. Humphrey, 512 U.S. 477 (1994), bars a § 1983 claim only where success would necessarily imply the invalidity of an existing criminal conviction. Heck presents no bar here for two independent reasons: (a) Plaintiff was never convicted — all charges were dismissed on June 9, 2025, when the ECDA conceded it could not contest the CPL § 30.30 motion; and (b) Thompson v. Clark, 596 U.S. 36 (2022), confirmed that a § 1983 malicious prosecution claim requires only that the prosecution ended without a conviction — not with an affirmative indication of innocence. Because there is no conviction to be invalidated, Heck presents no obstacle to any claim in this complaint. Plaintiff states this preemptively to address any argument Defendants may raise to the contrary.

112. FAVORABLE TERMINATION IS ESTABLISHED. The Supreme Court held in Thompson v. Clark, 596 U.S. 36 (2022), that to demonstrate a favorable termination of a criminal prosecution for purposes of a Fourth Amendment § 1983 malicious prosecution claim, a plaintiff need only show that the prosecution ended without a conviction — no affirmative indication of innocence is required. Here, the ECDA conceded it could not contest Plaintiff's CPL § 30.30 motion and agreed to dismissal of all charges on June 9, 2025 — nearly eight months after Plaintiff's arrest. The prosecution ended without any conviction. Thompson v. Clark is fully

satisfied. The gravity of this cannot be overstated: every prior arrest by the same complainant also ended without a conviction, establishing a pattern that no reasonable prosecutor operating in good faith could ignore.

113. THE INVESTIGATIVE FUNCTION STRIPS ABSOLUTE IMMUNITY. While prosecutors enjoy absolute immunity for acts intimately associated with the judicial phase of the criminal process under Imbler v. Pachtman, 424 U.S. 409 (1976), that immunity does not extend to investigative or administrative conduct. The Supreme Court held in Burns v. Reed, 500 U.S. 478 (1991), that a prosecutor advising police in the investigative phase of a criminal case is not entitled to absolute immunity — only qualified immunity. The Supreme Court further held in Buckley v. Fitzsimmons, 509 U.S. 259 (1993), that prosecutors who participate in shaping evidence, coaching complainants on how to phrase criminal complaints, or conducting any investigative function before charges are filed receive only qualified immunity. Applied here: ECDA staff who guided Officer Prana in drafting the arrest complaint, advised BPD on probable cause, and coordinated the pretextual basis for Plaintiff's detention before charges were formally filed acted in an investigative capacity and hold only qualified immunity.

113A. THE ECDA HAS A DOCUMENTED PRIOR PATTERN OF ACTING OUTSIDE PROSECUTORIAL IMMUNITY. This is not the first time the ECDA has engaged in conduct that strips prosecutors of absolute immunity protection. In Plaintiff's prior federal action, No. 1:21-cv-00449 (W.D.N.Y.), ADA John Schoemick, a male Assistant District Attorney employed by the ECDA, was named as an individual defendant for conduct that falls squarely within the investigative function identified in Burns v. Reed, 500 U.S. 478 (1991) and Buckley v. Fitzsimmons, 509 U.S. 259 (1993). Specifically, ADA John Schoemick communicated directly with police officers and caused Plaintiff's charges to be reduced from a police-issued felony to a misdemeanor — before any warrant was issued and while the matter remained in the pre-charge investigative phase at the DA's office. This conduct — a male prosecutor advising police on charge classification before formal charges are brought — is precisely the category of investigative-phase activity for which the Supreme Court in Burns v. Reed held that only qualified immunity, not absolute immunity, applies. Schoemick was terminated from No. 1:21-cv-00449 by order of Hon. Lawrence J. Vilardo dated March 14, 2024, after Plaintiff failed to timely amend within the court's 45-day window. That termination was procedural in nature — no court ever reached the merits of Schoemick's individual immunity defense. Because the immunity question was never adjudicated on the merits, there is no res judicata bar to asserting claims against him in this action. Plaintiff re-files against ADA John Schoemick pursuant to the continuing wrong doctrine, as his investigative-phase conduct is part of the same unbroken pattern of ECDA misconduct continuing through the present. His prior conduct establishes: (a) the ECDA has a prior

documented instance of a prosecutor performing investigative-phase conduct that strips absolute immunity protection under Burns v. Reed; (b) this demonstrates a custom and practice of ECDA prosecutors crossing from protected advocacy into unprotected investigation; and (c) ECDA leadership — under both Flynn and Keane — had actual notice through the prior federal litigation that Schoemick's investigative-phase conduct had been federally challenged, yet implemented no corrective policy, training, or supervisory protocol to prevent recurrence. This establishes a Monell pattern under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), for which Erie County is municipally liable.

114. DA FLYNN — FINAL POLICYMAKER LIABILITY UNDER PEMBAUR. John Flynn served as Erie County District Attorney from approximately 2020 through March 29, 2024. As an elected district attorney, Flynn was the final policymaker for the ECDA. Under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986), a single deliberate decision by a final policymaker constitutes municipal policy sufficient to support Monell liability — even when that decision occurs only once. Flynn's deliberate policy decisions, made as the sole final policymaker of the ECDA, include: (a) authorizing continued prosecution of Plaintiff across multiple arrest cycles despite zero convictions; (b) failing to create or enforce any investigative protocol requiring assessment of complainant credibility before authorizing arrest, despite Plaintiff's fourteen prior successful defenses; (c) permitting ECDA resources to be used as instruments of racial retaliation against a Black homeowner; (d) withholding exculpatory evidence, including judicial findings characterizing Eckert's claims as "dubious"; and (e) establishing the institutional culture and practices that his successor, DA Keane, directly continued. Flynn is liable both individually for these policy decisions and as the originating policymaker for the Monell custom that persisted after his departure.

115. DA KEANE — DIRECT AUTHORIZATION OF UNTENABLE PROSECUTION. DA Michael Keane (Erie County DA; not to be confused with his brother, retired Judge Kevin Keane of Buffalo City Court) personally authorized and oversaw the prosecution of Plaintiff for nearly one year with actual knowledge that: (a) Eckert was not a viable victim, as established by her own video evidence showing she was never in the driveway or in the path of the weapon; (b) Judge Wilson had dismissed a nearly identical charge in July 2024 with a civil directive; (c) all fourteen prior arrests by the same complainant resulted in zero convictions; (d) the underlying property dispute was judicially characterized as civil in nature; and (e) no valid restraining order existed at the time of Plaintiff's arrest. The ECDA under Keane then repeatedly attempted to coerce Plaintiff into accepting an ACD — a diversion that would have produced no conviction but foreclosed civil litigation — demonstrating the prosecution was maintained not to pursue justice but to extract a concession from Plaintiff. This constitutes malicious prosecution in violation of the Fourth and Fourteenth Amendments.

116. WRAY'S CONDUCT FALLS OUTSIDE JUDICIAL IMMUNITY. Defendant Wray's conduct at arraignment — compelling Plaintiff to surrender property rights under threat of extended detention, refusing Plaintiff access to charging documents, shackling Plaintiff without individualized necessity findings in violation of Deck v. Missouri, 544 U.S. 622 (2005), and conducting ex parte communications about the pending criminal case through her husband and his assistant — removed her from the protection of judicial immunity. Judicial immunity does not extend to: (a) actions taken in the clear absence of jurisdiction (Stump v. Sparkman, 435 U.S. 349 (1978)); (b) acts outside official judicial duties such as independently investigating a party's identity; or (c) ex parte communications violating Rule 2.9 of the Rules of Judicial Conduct. Wray's explicit threat to leave Plaintiff in jail and "let them do the work" on Plaintiff's property was a directive to compel an unconstitutional taking without due process — outside the bounds of any judicial function.

116A-1. JUDGE HOLT IN WILLIAMSON AND JUDGE WRAY — THE JUDICIAL INSTRUMENT OF RACIAL DISPOSSESSION. The conduct of Defendant Wray fits a documented national pattern of judges using their authority as an instrument of racial property dispossession — a pattern now directly confirmed by the pending federal complaint in Williamson et al. v. Morgan County, Georgia et al., No. 3:2026cv00052 (M.D. Ga. 2026). In Williamson, Judge Holt used a good behavior hearing — a proceeding whose stated purpose had nothing to do with property rights — as the vehicle to strip a Black man of his deed and transfer his property to the white family that wanted his land. The judge did not adjudicate a property dispute. He repurposed a judicial proceeding as a mechanism of racially motivated property confiscation, acting not as a neutral arbiter but as an active participant in the dispossession scheme. Defendant Wray's conduct at Plaintiff's arraignment follows the identical pattern. Wray did not merely make a judicial ruling on the criminal charges before her. She used the coercive power of the arraignment — a proceeding whose stated purpose was determining bail and conditions of release on a menacing charge — to threaten Plaintiff with continued detention unless Plaintiff surrendered her property rights to Eckert, a white neighbor whose claim to those rights no court had ever validated. Like Judge Holt in Williamson, Wray used her judicial position not to adjudicate the matter before her but to accomplish a property transfer from a Black homeowner to a white neighbor through the coercive power of judicial detention and the implicit threat of continued incarceration. The parallel between Judge Holt and Judge Wray is not superficial. Both are judges. Both used proceedings for purposes beyond their lawful scope. Both acted in furtherance of a white party's interest in a Black person's property. And critically, both stepped outside the function that judicial immunity is designed to protect. Stump v. Sparkman, 435 U.S. 349 (1978), holds that absolute judicial immunity does not extend to acts taken in the clear absence of all jurisdiction or in the complete absence of a legitimate judicial purpose. A judge who threatens a Black defendant with continued incarceration unless she relinquishes her property rights to a white neighbor is not exercising the judicial function that

immunity protects — she is performing the same function as Judge Holt: using the robes of judicial office to accomplish what the law would not otherwise permit.

116A. WILLFUL IGNORANCE BY THE ECDA OF EVIDENCE IN ITS POSSESSION. The ECDA's eleven-month prosecution of Plaintiff was not maintained because the evidence was ambiguous — it was maintained despite evidence already in the prosecution's possession that conclusively undermined the charge. The ECDA had, at all relevant times: (a) Eckert's own Facebook Live video showing she was not in the driveway and not in the path of Plaintiff's weapon; (b) Judge Wilson's July 2024 dismissal order with civil directive, on file at the ECDA; (c) the complete arrest history showing fourteen prior charges by the same complainant with zero convictions; (d) Plaintiff's statements, confirmed by Lt. Danner, that no valid restraining order existed; and (e) the prior judicial finding characterizing Eckert's claims as "dubious." A prosecutor who possesses exculpatory evidence and deliberately declines to act on it is not exercising prosecutorial discretion — he is engaged in willful blindness that this Circuit has recognized as constituting the malice element of a malicious prosecution claim. Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997). The ECDA's repeated attempts to coerce an ACD rather than dismissing a charge it knew was unsupportable confirms that the prosecution was maintained not in the pursuit of justice but in deliberate disregard of the truth.

116B. DA KEANE'S WILLFUL NON-INVESTIGATION AS FINAL POLICYMAKER. As the final policymaker for the ECDA, DA Keane had both the authority and the obligation to review the prosecution's evidentiary basis, particularly given Plaintiff's documented history of fifteen arrests without a single conviction by the same complainant. Keane's failure to direct any review of Eckert's credibility, any examination of the video evidence, or any inquiry into the July 2024 Wilson dismissal — all of which were accessible and available — constitutes willful non-investigation at the policymaker level. Under City of Canton v. Harris, 489 U.S. 378 (1989), a policymaker's deliberate indifference to a known pattern of constitutional violations is itself the policy that Monell liability requires. Keane's failure to look at the evidence in his own office's files is not a failure of resources — it is a deliberate choice to look away, and that choice caused Plaintiff's eleven-month malicious prosecution.

116D. ECDA'S DELIBERATE FAILURE TO PROSECUTE ECKERT FOR COVID ASSAULT — EVIDENCE OF RACIAL DOUBLE STANDARD IN EVIDENCE USE. On September 20, 2021, Eckert — while confirmed COVID-positive — deliberately approached Plaintiff's property fence, coughed on Plaintiff through the fence, and told Plaintiff: "take all this covid" and "that's why you got lupus, I hope you die." This conduct was captured on video. Eckert admitted having COVID and coughing to responding police officers. Plaintiff — a lupus patient for whom COVID poses a documented, serious, and potentially fatal health risk — sought prosecution of Eckert under N.Y. Penal Law § 490.55, Criminal Use of a Chemical or Biological

Weapon in the First Degree. An Erie County Grand Jury convened. The Grand Jury did not indict Eckert. The reason: the ECDA — under DA John Flynn — failed to present the video evidence of Eckert's own on-camera admission to the Grand Jury, leaving the matter as a he-said-she-said dispute that the Grand Jury could not resolve beyond reasonable doubt. The ECDA possessed the video. They chose not to show it. This deliberate withholding of material evidence from a Grand Jury to prevent indictment of a white complainant who had deliberately exposed a Black disabled lupus patient to COVID is the same Brady-type evidence suppression pattern that underlies the ECDA's misconduct throughout this case — applied here in reverse, to protect Eckert rather than to prosecute Plaintiff. The ECDA's asymmetric use of video evidence — withholding it when it would indict Eckert, relying on it when it purportedly supported charging Plaintiff — is among the most powerful evidence of the racial double standard at the heart of Plaintiff's equal protection and Fair Housing Act claims. This constitutes an independent basis for Flynn's individual liability as final policymaker, and additional Monell evidence of the ECDA's institutionalized racial discrimination in prosecution decisions.

116C. FLYNN'S POLICY OF INSTITUTIONALIZED NON-INVESTIGATION. During John Flynn's tenure as DA (2020–March 29, 2024), Plaintiff was arrested by the same complainant multiple times with all charges ultimately failing. Flynn, as final policymaker, never directed any review of Eckert's complaint history, never implemented a protocol requiring investigators to assess repeat complainant credibility, and never took any corrective action despite accumulating evidence that Eckert's claims were repeatedly adjudicated against her. This deliberate institutional practice of willful non-investigation — sustained across years and multiple failed prosecutions — is the policy-level failure that enabled every subsequent arrest, including the October 2025 arrest under DA Keane. Flynn's institutionalized look-away policy is itself a Monell custom and practice for which Erie County is liable under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986).

117. FACTUAL ALLEGATIONS — ZIMMERMAN AND LEGAL AID BUREAU. The following facts are alleged not as the basis for individual damages claims against Zimmerman personally, but as evidence of the Legal Aid Bureau's institutional participation in the pattern of misconduct directed at Plaintiff, and as evidence supporting the ECDA conspiracy claim. On March 9, 2025, Warren Griffiths — Plaintiff's public defender who had been vigorously and effectively litigating Plaintiff's case — was removed and replaced by Karla Zimmerman of the Legal Aid Bureau. Griffiths' removal occurred at the precise moment he was preparing a motion to dismiss. Zimmerman thereafter: (a) ignored Plaintiff's requests to schedule meetings to discuss the case; (b) filed motions without Plaintiff's review, including a factually erroneous motion to dismiss that had to be withdrawn; (c) consistently deferred to the DA's office for guidance during proceedings rather than advocating for her client; (d) repeatedly attempted to coerce Plaintiff into accepting an ACD; and (e) told Plaintiff: "I'm a trained attorney, you are not, and if you don't want to take my advice then maybe you should be pro se again." The temporal correlation between Griffiths' removal — at the precise moment an effective defense

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

motion was imminent — and his replacement with an attorney who actively undermined Plaintiff's defense and worked toward a plea supports the inference that Zimmerman's actions were made in coordination with, or at the behest of, state actors. These facts are alleged solely as evidence supporting the malicious prosecution and conspiracy claims against ECDA defendants. The Legal Aid Bureau is not named as a defendant in this action.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Five Million Dollars ($5,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT V — GROSS NEGLIGENCE AND EQUAL PROTECTION VIOLATIONS

42 U.S.C. § 1983; Title VII Civil Rights Act; Title II ADA; Fair Housing Act

All Defendants

117. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

118. All Defendants owed Plaintiff a duty of care to provide fair and equitable treatment in the investigation and prosecution of complaints, and in the provision of government services.

119. All Defendants breached this duty by affording Eckert — a white complainant — substantially greater access to police resources, court processes, and prosecutorial support than was afforded to Plaintiff, a Black disabled homeowner, in direct violation of the Equal Protection Clause of the Fourteenth Amendment.

119A. WILLFUL FAILURE TO INVESTIGATE THE COMPLAINANT'S CREDIBILITY. All Defendants' breach of duty was not merely one of disparate treatment in the abstract — it was grounded in a specific, deliberate failure to investigate the credibility and accuracy of Eckert's claims before acting on them. Each Defendant who received an Eckert complaint, participated in Plaintiff's arrest, or sustained the prosecution had access to: (a) the prior complaint history showing fourteen prior failed charges; (b) the judicial finding characterizing Eckert's claims as "dubious"; (c) Judge Wilson's civil directive; and (d) the court order itself, which established it was Plaintiff — not Eckert — who held the easement. Every Defendant deliberately chose not to look at this information. That willful non-investigation is the mechanism by which racial disparate treatment was operationalized: by never investigating a white complainant's claims, Defendants ensured that Eckert's false narrative would always prevail over Plaintiff's documented legal rights.

119B. THE DOUBLE STANDARD IN INVESTIGATION. The willful failure to investigate Eckert's claims stands in stark contrast to Defendants' treatment of Plaintiff. When Plaintiff called 911 regarding trespassers on her property, BPD took approximately twenty minutes to respond. When Eckert and workers called about a gun, BPD responded in under three minutes. When Plaintiff asserted her property rights, BPD required her to produce legal documentation on the spot. When Eckert asserted a false easement claim, BPD accepted it without reviewing a single document. This asymmetric application of investigative scrutiny — demanding proof from the Black homeowner while granting unquestioned credibility to the white complainant — is precisely the kind of racially discriminatory law enforcement that the Equal Protection Clause prohibits. Yick Wo v. Hopkins, 118 U.S. 356 (1886); Brown v. City of Oneonta, 221 F.3d 329 (2d Cir. 2000).

120. Defendants allowed Eckert to falsely claim an easement, affirmed that claim to Plaintiff's detriment, and failed to investigate Eckert's documented prior pattern of fraudulent claims — despite a prior judicial finding characterizing Eckert's claims as "dubious."

121. Selective enforcement of law based on race violates the Equal Protection Clause. State v. Ivey, 360 N.C. 562 (2006); Yick Wo v. Hopkins, 118 U.S. 356 (1886).

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Three Million Dollars ($3,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT VI — STATE-CREATED DANGER

42 U.S.C. § 1983; Fair Housing Act; ADA

All Defendants

122. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

122A. WILLFUL IGNORANCE AS STATE-CREATED DANGER. The state-created danger doctrine applies where state actors create or increase a danger to an individual through affirmative conduct. Here, each Defendant's willful refusal to investigate Eckert's claims before acting on them was itself an affirmative act that created and amplified the danger Plaintiff faced. By consistently validating Eckert's claims without investigation: (a) Defendants signaled to Eckert that she could make any complaint against Plaintiff and BPD would act on it —

emboldening Eckert to escalate her conduct to the October 2025 confrontation; (b) Defendants created a dynamic where Plaintiff's exercise of her lawful rights on her own property — including her right to bear arms to protect that property — would be treated as criminal while Eckert's trespass was treated as lawful; and (c) Defendants' pattern of willful non-investigation trained Eckert to understand that she could stage confrontations on Plaintiff's property, verbally abuse and racially demean Plaintiff, and rely on BPD to arrest Plaintiff when Plaintiff responded. This is not a failure of the state to protect — it is an affirmative, willful creation of a power imbalance that made the October 2025 confrontation and Plaintiff's resulting injury not merely foreseeable but inevitable.

123. By exclusively responding to and crediting Eckert's complaints while ignoring or criminalizing Plaintiff's, Defendants created an entitlement and power structure that empowered Eckert to act recklessly and without fear of legal consequences — including orchestrating the October 2025 confrontation, streaming it publicly, and inciting racial hostility against Plaintiff.

124. By denying Plaintiff medical care and then physically abusing her when she sought relief, all jail staff Defendants directly created danger to Plaintiff's health and caused permanent physical injury.

125. By granting workers access to Plaintiff's land while she was in custody, BPD officers created a physical and legal danger to Plaintiff's property rights and her security in her home.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Ten Million Dollars ($10,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT VII — FAILURE TO SUPERVISE, DISCIPLINE, AND TRAIN

42 U.S.C. § 1983; ADA; Fair Housing Act

All Supervisory and Municipal Defendants, including Gramaglia and Wright

126. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

127. BPD supervisors — including Lieutenants, Captains, and Chiefs — were aware of the recurring pattern of false charges against Plaintiff, the prior judicial dismissals, and BPD's history of accepting Eckert's claims without investigation. They took no corrective action.

127A. SUPERVISORY WILLFUL IGNORANCE AS INSTITUTIONAL POLICY. BPD's supervisory chain did not merely fail to act on the documented pattern of false charges against Plaintiff — they actively chose not to investigate it. Internal Affairs complaints filed by Plaintiff, including the February 12, 2025 online complaint, were received and not meaningfully acted upon. A supervisor who receives a complaint of constitutional violations and deliberately chooses not to investigate is not protected by qualified immunity — the deliberate decision not to look is itself the constitutional violation. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (supervisory liability attaches where supervisor's deliberate indifference to known misconduct amounts to gross negligence). BPD's supervisory chain was presented with fifteen arrests of the same person by the same complainant with zero convictions, a prior federal lawsuit, and multiple Internal Affairs complaints — and chose, at every juncture, not to investigate. That sustained, deliberate non-investigation at the supervisory level is itself the policy that caused each successive constitutional violation against Plaintiff.

127B. FAILURE TO INVESTIGATE ECKERT'S COMPLAINT HISTORY. No BPD supervisor ever directed a review of Eckert's complaint history against Plaintiff, despite that history being stored in BPD's own records system and accessible in real time — as Lt. Danner demonstrated when he looked up the May 2024 arrest at the October 2025 scene. The supervisory failure is not one of access — it is one of will. A supervisory policy that permits officers to arrest the same person fifteen times on complaints from the same source without ever requiring a review of that source's reliability is not a neutral administrative practice. It is a custom of deliberate non-investigation that produces racially discriminatory outcomes as reliably as any intentional discriminatory policy. This custom is actionable under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

128. Lt. John Doe of Buffalo City Jail failed to supervise John Doe 1, who physically abused Plaintiff on three separate occasions during the same restraint episode. Lt. John Doe was present and witnessed at least some of the abuse yet failed to intervene.

128A. WILLFUL IGNORANCE OF ABUSE IN PROGRESS. Lt. John Doe was physically present during the restraint of Plaintiff and witnessed John Doe 1's conduct on multiple occasions — each time looking away and allowing the abuse to resume. This is not a failure of information; it is a failure of will. Lt. John Doe saw John Doe 1 shove his fingers into Plaintiff's nose. He saw Plaintiff gasp for air when John Doe 1 applied a chokehold. He heard Plaintiff repeatedly report that the shoulder strap was embedded in her arm and that she was losing circulation. He heard staff outside the door laughing at Plaintiff's pain. A supervising officer who witnesses these acts and responds by looking away — and who then threatens to leave Plaintiff in the restraint chair when she demands medical care — is not failing to supervise. He is willfully choosing not to see what is directly in front of him. That willful ignorance of ongoing

abuse by a supervisor who has the authority and duty to stop it is itself a constitutional violation under the Fourteenth Amendment.

128B. GRAMAGLIA AND WRIGHT — SUPERVISORY DELIBERATE INDIFFERENCE. Count VII's failure to supervise claim is strongest as to Gramaglia and Wright. Gramaglia received thirteen documented direct communications from Plaintiff between December 2020 and March 2021, responded to none, and allowed the discriminatory enforcement pattern to continue uninterrupted. Wright served as Commissioner during the period when three major federal verdicts against the same institutional actors — Walker, Boyd, and the prior settlements with Plaintiff herself — placed every reasonable policymaker on actual notice of a systemic constitutional problem. Neither implemented any corrective policy, conducted any review, or took any supervisory action. The failure of two successive BPD policymakers to respond to documented, repeated, specific complaints of racial discrimination in law enforcement enforcement directed at the same individual is itself the institutional custom that Monell requires. Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

128C. DIPASQUALE AND MCDERMOTT CONDUCT AS SUPERVISORY FAILURE EVIDENCE. The conduct of Officer DiPasquale and Detective McDermott — addressed as individual defendants in Case No. 1:21-cv-00449 — is relevant here as evidence of what BPD supervisors Gramaglia and Wright knew or should have known and failed to correct. DiPasquale's "would've done the same thing" statement and his conditioning of felony assault charges on Plaintiff also being charged were the kind of officer conduct that a minimally attentive supervisory chain would have identified and addressed. McDermott's asymmetric evidentiary standards across multiple documented incidents constitute exactly the pattern of racial bias that a properly functioning IA process and supervisory chain should have caught. Gramaglia's thirteen non-responses and Wright's institutional indifference are most powerfully understood in the context of what they were choosing not to see.

129. Erie County supervisory staff failed to ensure ADA compliance despite Plaintiff's direct complaints and the existence of written training protocols requiring the provision of chairs upon request.

130. ECDA supervisors, including DA Keane, failed to supervise staff who denied Plaintiff reasonable accommodation, ignored her ADA Compliance Officer request, denied FOIL requests, and issued retaliatory property violations.

131. All municipal and supervisory Defendants receive cultural competency, equity, diversity, and inclusion training that would have protected Plaintiff's rights. Their failure to apply that

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

training, correct subordinates, or respond to Plaintiff's repeated complaints demonstrates deliberate indifference.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Three Million Dollars ($3,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT VIII — SUBSTANTIVE DUE PROCESS

DUE PROCESS VIOLATION — RELEASE OF PRIVATE BODYCAM FOOTAGE WITHOUT NOTICE OR PRIVACY ANALYSIS. Plaintiff has a constitutionally protected privacy interest in bodycam footage recorded on her own private property at her own home. The Supreme Court has recognized that the home is the most constitutionally protected of all spaces, and that government collection and disclosure of surveillance footage from a private residence implicates the Fourth and Fourteenth Amendment privacy interests of the person depicted. BPD's release of bodycam footage from Plaintiff's private property to Eckert — Plaintiff's active litigation adversary in pending federal civil rights proceedings — without notice to Plaintiff, without giving Plaintiff an opportunity to object, without verifying the requester's claimed victim status, and without conducting any privacy analysis, constitutes a violation of Plaintiff's substantive due process rights under the Fourteenth Amendment. The harm is compounded by the fact that the release was made on the basis of a false statement by Eckert. BPD's failure to verify Eckert's claimed status before releasing footage of a non-consenting private person on private property is not a procedural technicality — it is the same institutional indifference to Plaintiff's rights that produced fifteen wrongful arrests. Connecticut v. Doehr, 501 U.S. 1 (1991) (even temporary deprivation of a protected interest requires procedural protection including notice and opportunity to be heard).

42 U.S.C. § 1983; Title VII; ADA; Fair Housing Act

All Defendants

132. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

133. Defendants Wray, BPD, DA Keane, and the ECDA knew that Plaintiff had been arrested and prosecuted in May 2024 for the same underlying conduct, that Judge Wilson had dismissed those charges with a directive that the property dispute was civil in nature, and that Eckert had been directed to return to Judge Grisanti. Despite this knowledge, Defendants pursued a new prosecution arising from substantially identical facts.

134. DA Keane had actual knowledge of Plaintiff's fourteen prior prosecutions and the absence of any conviction, yet did nothing to independently assess the validity of Eckert's October 2025 claims.

135. All Defendants authorized and encouraged Eckert's conduct by affirming her false easement claim, providing law enforcement support for her activities, and using prosecutorial resources on her behalf — all while denying Plaintiff the equal protection and due process of law.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Three Million Dollars ($3,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT IX — RETALIATION

### 42 U.S.C. § 1983; ADA; Fair Housing Act §§ 3617, 3631

### All Defendants

136. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

136A. THE ARTICLE 78 AS EVIDENCE OF RETALIATION AND ACCESS DENIAL. The filing of Plaintiff's Article 78 in April 2021 — naming BPD, Chief Judge Hannah, Buffalo City Court, Court Clerk Webb, and the NY Attorney General — and its denial, is direct evidence that by April 2021 every available channel of legal recourse had been closed to Plaintiff through the coordinated conduct of state actors. A person who is compelled to sue a chief judge for the right to prosecute her own attacker has not merely been inconvenienced — she has been denied the equal protection of the laws in the most complete and documented way possible. The denial of the Article 78 is cited herein as additional evidence of the retaliation and systemic denial of rights that Plaintiff experienced throughout 2020-2021, and as the proximate cause of her filing of the original federal complaint in Case No. 1:21-cv-00449 in March 2021.

139A. JUDGE WARD'S JUDICIAL BIAS — ADDITIONAL EVIDENCE OF PATTERN. Hon. Justice Dennis Ward of Erie County Supreme Court presided over multiple proceedings between Plaintiff and Eckert. His conduct demonstrates the same pattern of bias that characterized Judge Wray's conduct in the criminal proceedings: (a) Ward dismissed Plaintiff's case against Eckert and Travelers Insurance (Index No. 806407/2021) for insurance fraud and cyberbullying in its entirety on June 15, 2022, without prejudice — a case in which Plaintiff documented Eckert's sustained online harassment campaign and Travelers Insurance's indemnification of fraudulent claims against Plaintiff's own policy; (b) Ward dismissed Eckert's refiled case (Index No.

803580/2022) on procedural grounds when Eckert failed to timely serve the summons and complaint; but (c) Ward warned Plaintiff — not Eckert — that filing lawsuits "become harassment or misuse of the Courts," despite the fact that by that point Eckert had filed multiple cases against Plaintiff while Plaintiff had filed one case against Eckert that was dismissed without prejudice. Directing a judicial harassment warning at the party with one dismissed case while the party with multiple pending cases receives no such admonition is itself evidence of the judicial bias pattern that Plaintiff has experienced across every level of the Erie County court system. Plaintiff does not name Judge Ward as a defendant at this time but notes that his conduct, combined with Wray's conduct, establishes a systemic pattern of judicial hostility toward Plaintiff in Erie County proceedings that supports the equal protection and conspiracy claims asserted herein.

139B. CHIEF JUDGE CRAIG HANNAH — DENIAL OF PRIVATE PROSECUTION RIGHT. Chief Judge Craig Hannah of Buffalo City Court was named as a respondent in Plaintiff's April 2021 Article 78 proceeding. The Article 78 sought authorization for Plaintiff to exercise the right of private prosecution against Eckert under New York law, after every other avenue of legal recourse had been closed to her. The Article 78 was denied. Chief Judge Hannah is not named as a defendant in this action. His role as respondent in the Article 78 and the denial of that petition is cited as additional evidence of the systemic judicial and institutional indifference that characterized Plaintiff's attempts to access justice between 2020 and 2021, and as context establishing the degree of desperation that preceded Plaintiff's filing of the original federal complaint in 1:21-cv-00449.

137. Plaintiff previously engaged in federally protected activity by recording and reporting Erie County's denial of bathroom access to a disabled person, filing complaints with the NYSDHR, and pursuing civil litigation. As a result of these complaints, Erie County was found to have engaged in discrimination (a "secret shopper" test showed a white person was granted access while Plaintiff was denied) and was compelled to open a public bathroom and settle with Plaintiff. During a prior retaliatory arrest by EC Sheriff's deputies, Plaintiff was physically injured, and EC again settled after Plaintiff's attorney intervened.

138. Following Plaintiff's February 2025 ADA complaint regarding ECDA staff, the trust holding Plaintiff's property received retaliatory municipal citations within weeks for items that were not legitimate violations.

139. Plaintiff alleges that the October 2025 arrest and eleven-month prosecution constitute retaliation for Plaintiff's prior protected speech, prior successful defenses, prior civil rights complaints, and for "daring to use her voice against systemic racism" — as Plaintiff has been told, through the actions of Defendants, that she should "know her place."

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Three Million Dollars ($3,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT X — FAIR HOUSING ACT VIOLATIONS

42 U.S.C. §§ 3604, 3613, 3617, 3631

All Defendants, including Private Defendant Rachel Eckert

140. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

141. Plaintiff is a Black, disabled homeowner. She is a member of two protected classes under the Fair Housing Act.

142. Defendant Eckert, through fifteen false police complaints, fraudulent misrepresentation of court documents, social media incitement of racial hostility, public disclosure of Plaintiff's home and vehicle on a white patriot podcast including Plaintiff's license plate number, her explicit statement in open court before Judge Ward that her goal is to "make Meadows move" by obtaining a judgment large enough that Plaintiff cannot pay so that the Erie County Sheriff can execute a forced sale of Plaintiff's home — a specific, identifiable mechanism of racially motivated dispossession — and sustained interference with Plaintiff's peaceful occupancy, has engaged in a pattern of conduct making Plaintiff's dwelling "unavailable" and interfering with Plaintiff's FHA-protected rights on account of race, in violation of 42 U.S.C. §§ 3604 and 3617.

143. State actor Defendants aided, abetted, and actively participated in this scheme by serving as instruments of Eckert's effort to dispossess Plaintiff, in violation of 42 U.S.C. § 3617.

144. Eckert's use of force or threat of force — including incitement of violent social media commentary, public identification of Plaintiff's home and vehicle, and coordinated use of law enforcement as a weapon — constitutes a violation of 42 U.S.C. § 3631.

WHEREFORE, Plaintiff demands judgment against all Defendants — including private Defendant Eckert — in an amount in excess of Five Million Dollars ($5,000,000) in compensatory, punitive, and exemplary damages, plus injunctive relief, plus interest, costs, and all other relief this Court finds appropriate.

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

## COUNT XI — CONSPIRACY TO OBSTRUCT JUSTICE

42 U.S.C. §§ 1983, 1985; Title VII; ADA; Fair Housing Act

All Defendants

145. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

146. Defendants Wray, BPD, BPD officers, jail staff, ECDA, and Flynn (during his tenure) worked in concert to silence Plaintiff and remove her right to free speech and her land and property owner rights by unlawfully arresting, jailing, and prosecuting Plaintiff, and by permitting Eckert to claim and use Plaintiff's property during Plaintiff's wrongful detention — conduct consistent with prior BPD misconduct challenged in other federal proceedings.

147. This conspiracy was and is motivated by racial and retaliatory animus toward Plaintiff for her exercise of First Amendment rights and her successful prior defenses.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Three Million Dollars ($3,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT XII — VIOLATION OF FIRST AMENDMENT RIGHTS

THE ARTICLE 78 AS FIRST AMENDMENT ACCESS-TO-COURTS VIOLATION. The First Amendment right to petition the government for redress of grievances and the Fourteenth Amendment right of meaningful access to courts are among the most fundamental constitutional protections. Christopher v. Harbury, 536 U.S. 403, 413-14 (2002); Bill Johnson's Restaurants v. NLRB, 461 U.S. 731 (1983). On or about April 23, 2021, after over a year of being systematically denied access to every available channel of legal recourse, Plaintiff filed an Article 78 special proceeding in New York State Supreme Court against: (1) the Buffalo Police Department; (2) Craig Hannah, Chief Judge of Buffalo City Court; (3) Buffalo City Court itself; (4) Erika Webb, Buffalo City Court Clerk; and (5) the New York State Attorney General. The Article 78 sought a court order authorizing Plaintiff to exercise the right of private prosecution against Eckert under New York law — because BPD and the ECDA had so thoroughly blocked every normal channel of justice that Plaintiff had no other means of obtaining accountability for an attacker who had put her in the hospital with a concussion and collapsed lung. The Article 78 was denied. The fact that a disabled Black homeowner was forced to petition a court for the right to prosecute her own attacker is itself the constitutional violation. It demonstrates that by April 2021, Plaintiff's First Amendment right to petition for redress of grievances had been rendered

meaningless: she had petitioned BPD — refused; she had petitioned the ECDA — ignored; she had petitioned the Deputy Commissioner — thirteen times without a response; she had petitioned the DA — ignored; and when she petitioned the courts themselves for the right to prosecute her own case, that petition was denied too. The New York Attorney General, formally served as a respondent, had judicial notice by April 2021 that a Black disabled homeowner was being denied equal access to legal process in Buffalo through racial discrimination. The AG took no action. See Exhibit VV — Article 78 Petition and Order of Denial.

42 U.S.C. § 1983; ADA; Fair Housing Act

All State Actor Defendants

148. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

149. The First Amendment protects the right to freedom of speech and to petition the Government for a redress of grievances, as applied to the States through the Fourteenth Amendment. Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976).

150. Plaintiff has engaged in protected First Amendment activity by filing civil rights complaints, recording and publicizing government misconduct, pursuing legal remedies against state actors, and speaking publicly about racial discrimination by law enforcement and the courts.

151. Defendants have engaged in an ongoing effort to harass, threaten, intimidate, prosecute, and injure Plaintiff for her exercise of First Amendment rights. This includes using criminal prosecution as a tool of suppression and permitting Eckert's retaliatory social media campaign without legal consequence.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Three Million Dollars ($3,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT XIII — VIOLATION OF THE EQUAL PROTECTION CLAUSE

42 U.S.C. §§ 1981, 1983; Title VII; ADA; Fair Housing Act

All Defendants

152. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

153. The Equal Protection Clause requires the government to treat all similarly situated people alike. Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

154. Defendants treated Plaintiff — a Black, disabled homeowner — fundamentally differently from her white neighbor, Eckert. Eckert's complaints were accepted without scrutiny; Plaintiff's were ignored or used as a basis for further arrests. Eckert was granted free use of Plaintiff's property while Plaintiff was jailed.

154A. THE MECHANISM OF DISPARATE TREATMENT WAS WILLFUL NON-INVESTIGATION. The equal protection violation in this case did not require officers or prosecutors to act with conscious racial animus in each individual decision — it required only that they apply a systematically different standard of investigation to white and Black complainants. That is precisely what occurred. Eckert's claims were accepted at face value, every time, without documentary verification, without review of prior complaint history, and without any inquiry into the judicial findings already on record. Plaintiff's counter-assertions were dismissed, every time, without review of the same information. This asymmetric application of investigative scrutiny — full credulity for the white complainant, willful blindness to the Black homeowner's documentation — is the operational mechanism through which racial discrimination was implemented. The Equal Protection Clause does not permit a state to maintain a facially neutral 'accept all complaints' policy that it applies only in one racial direction. Yick Wo v. Hopkins, 118 U.S. 356, 373–74 (1886) ("the equal protection of the laws is a pledge of the protection of equal laws"); Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252 (1977) (discriminatory effect combined with historical background and pattern of decisions supports equal protection claim).

154B. THE NEW YORK ATTORNEY GENERAL HAD NOTICE AND DID NOTHING. Plaintiff's April 2021 Article 78 named the New York State Attorney General as a respondent, providing the state's chief law enforcement officer with formal judicial notice that a Black disabled homeowner was being denied equal access to legal process in Buffalo through racial discrimination by BPD and the ECDA. The Attorney General did not intervene, did not investigate, and took no action. The AG's failure to act on formal judicial notice of racially discriminatory law enforcement permitted the unconstitutional custom to continue unchallenged through the October 2025 arrest. While the AG is not named as a defendant in this action, the AG's formal notice and non-response is additional evidence of the systemic, institutionally entrenched nature of the racial discrimination Plaintiff has faced — discrimination that was visible enough to be pleaded in a court filing against a chief judge, formally served on the state's

top law enforcement officer, and still produced no response from any governmental actor at any level.

154C. THE WILLIAMSON PARALLEL — LAW ENFORCEMENT AS INSTRUMENT OF RACIAL PROPERTY DISPOSSESSION. The Equal Protection violation in this case — law enforcement accepting white complainants' property claims without investigation while criminalizing a Black homeowner's exercise of her lawful rights on her own property — is the same Equal Protection violation alleged in the pending Williamson federal complaint. In Williamson, Morgan County law enforcement repeatedly arrested a Black man for being on land to which he held a valid deed, while accepting the white family's competing property claims at face value without meaningful investigation. In the present case, BPD repeatedly arrested Plaintiff for exercising her lawful rights on her own property while accepting Eckert's easement claims at face value without ever reviewing the Fourth Department's ruling, the property survey, or the prior judicial dismissals. The constitutional principle is the same in both cases: the Equal Protection Clause prohibits state actors from applying different standards of property rights enforcement based on race. Yick Wo v. Hopkins, 118 U.S. 356 (1886). When law enforcement consistently credits white property claimants and criminalizes Black property owners across multiple jurisdictions — in Morgan County, Georgia and in Buffalo, New York — the pattern is not coincidental. It is constitutional discrimination, actionable under the Equal Protection Clause and the Fair Housing Act regardless of whether individual officers consciously acknowledge the racial basis of their conduct. Village of Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252 (1977).

155. Defendants reinforced to Eckert that she could use Plaintiff's property at will, including by allowing Eckert to install cameras recording Plaintiff on Plaintiff's own private property, and by permitting workers and their equipment to occupy Plaintiff's land without consent.

156. Plaintiff was denied the additional legal protections afforded to disabled persons under the ADA by state actors who were trained in and knew of those obligations.

WHEREFORE, Plaintiff demands judgment against Defendants in an amount in excess of Three Million Dollars ($3,000,000) in compensatory, punitive, and exemplary damages, plus interest, costs, and all other relief this Court finds appropriate.

## COUNT XIV — NEW YORK STATE SUPPLEMENTAL CLAIMS

False Arrest • False Imprisonment • Assault • Battery • Intentional Infliction of Emotional Distress

New York Civil Rights Law §§ 40, 40-c, 40-d • New York Executive Law §§ 296, 297

Defendants: City of Buffalo, BPD, Erie County, ECDA, Wray, Folts, Prana, Jail Staff, Schoemick, Eckert

255. Plaintiff incorporates all preceding paragraphs as though fully set forth herein. This Court has supplemental jurisdiction over the following state law claims pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy as Plaintiff's federal claims.

256. FALSE ARREST AND FALSE IMPRISONMENT. Under New York law, a claim for false arrest requires showing: (1) the defendant intended to confine Plaintiff; (2) Plaintiff was conscious of the confinement; (3) Plaintiff did not consent; and (4) the confinement was not otherwise privileged. Broughton v. State, 37 N.Y.2d 451 (1975). Plaintiff was arrested on October 11, 2025, on the basis of (a) a menacing charge arising from Plaintiff's lawful exercise of her Second Amendment rights on her own property, and (b) a claimed restraining order that did not exist and that officers refused to produce when Plaintiff demanded it. The arrest was not privileged because BPD officers lacked probable cause — they deliberately omitted material exculpatory facts from the arrest complaint under Franks v. Delaware and willfully ignored their own records showing the prior charge on the same conduct had been dismissed. Defendants BPD, Officer Prana, Lt. Danner, Detective Folts, and the City of Buffalo are liable for false arrest and false imprisonment under New York law.

257. ASSAULT AND BATTERY. Under New York law, assault is the intentional placing of another in apprehension of imminent harmful or offensive contact; battery is intentional harmful or offensive contact with another person without consent. John Doe 1's acts of inserting his fingers into Plaintiff's nose and compressing her septum, applying a chokehold to her trachea cutting off her ability to breathe, and over-tightening the shoulder strap of the restraint chair until it embedded in her arm and had to be forcibly removed constitute intentional, harmful, and offensive physical contact without any legal justification. Lt. John Doe's presence, his failure to intervene, and his subsequent refusal to release Plaintiff from the chair or obtain medical care constitute direct participation in the continuing assault and battery. Each of these acts constitutes assault and battery under New York common law for which the City of Buffalo is liable under respondeat superior.

258. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS. New York recognizes a cause of action for intentional infliction of emotional distress where conduct is so extreme and outrageous as to exceed all bounds tolerated in a civilized society and causes severe emotional distress. Howell v. New York Post Co., 81 N.Y.2d 115 (1993). The sustained campaign of fifteen unlawful arrests, the physical abuse in the restraint chair causing permanent nerve injury, the

denial of medical care to a lupus patient, the eleven-month malicious prosecution, the unlawful use of Plaintiff's property while she sat in jail, Wray's judicial threats to leave Plaintiff in jail and deliver her property to her neighbor, and Eckert's racially motivated dispossession campaign — taken as a whole and as a continuous course of conduct — constitute extreme and outrageous conduct that has caused Plaintiff prolonged, severe emotional distress, mental anguish, and lasting psychological harm. All named Defendants contributed to this conduct and are jointly and severally liable for its emotional consequences.

259. NEW YORK CIVIL RIGHTS LAW §§ 40, 40-c, AND 40-d. New York Civil Rights Law § 40 prohibits denial of equal enjoyment of public accommodations based on race. Section 40-c prohibits discrimination based on race and disability. Section 40-d provides civil penalties and a private right of action. The Erie County District Attorney's Office is a public governmental facility and service. On February 11, 2025, ECDA staff denied Plaintiff — a Black disabled woman — the reasonable accommodation of a chair during a meeting at the ECDA's office, despite multiple requests, despite Plaintiff identifying herself as disabled and in pain, and despite the county's own ADA Compliance Officer confirming that county training requires chairs to be provided on request. This denial of equal access to a public governmental service on the basis of race and disability violates §§ 40, 40-c, and 40-d of the New York Civil Rights Law, independently of and in addition to the federal ADA claim. Erie County and the named ECDA defendants are liable under these provisions.

260. NEW YORK EXECUTIVE LAW § 296 — NEW YORK STATE HUMAN RIGHTS LAW — ECDA DEFENDANTS. New York Executive Law § 296 prohibits discrimination on the basis of disability in places of public accommodation, which expressly includes governmental facilities and services. The denial of a reasonable accommodation to Plaintiff at the ECDA's office on February 11, 2025 — forcing a visibly disabled woman to sit on a potted plant in a public government building rather than provide a chair — constitutes disability discrimination in a place of public accommodation in violation of § 296. Erie County and the named ECDA defendants are liable for this violation. Executive Law § 297 provides a private civil right of action and authorizes the award of compensatory damages, civil penalties, and attorney's fees. Plaintiff invokes § 297 as an independent state law damages remedy.

261. NEW YORK EXECUTIVE LAW § 296(5) — ECKERT'S DISCRIMINATORY INTERFERENCE WITH HOUSING. New York Executive Law § 296(5) prohibits discrimination in the conditions, sale, or rental of real property based on race. Defendant Eckert's sustained, racially motivated campaign of interference with Plaintiff's use and enjoyment of her home — including fifteen false police complaints, fraudulent misrepresentation of court documents, public identification of Plaintiff's home and vehicle on a white patriot podcast, incitement of racial hostility on social media, and the explicit statement before Judge Ward of her

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

intent to force a Sheriff's sale of Plaintiff's home through a punitive legal judgment — constitutes discrimination in the conditions of real property on the basis of race in violation of § 296(5). This state law claim supplements the federal Fair Housing Act claims and provides an independent basis for damages under New York law.

WHEREFORE, Plaintiff demands judgment against Defendants on all state law claims in amounts to be determined at trial, including compensatory damages, punitive damages, civil penalties under New York Civil Rights Law § 40-d, attorney's fees under Executive Law § 297, and such other and further relief as this Court deems just and proper.

## MONELL LIABILITY — MUNICIPAL DEFENDANTS

Buffalo Police Department, City of Buffalo, Erie County, ECDA

157. Plaintiff incorporates all preceding paragraphs as though fully set forth herein.

157A. RESPONDEAT SUPERIOR AND DIRECT EMPLOYER LIABILITY — CITY OF BUFFALO. While Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), forecloses respondeat superior as a standalone basis for § 1983 municipal liability, the City of Buffalo faces direct employer liability under two independent theories: (a) jail staff including Lt. John Doe and John Does 1 and 2 physically abused Plaintiff within the scope of their employment as City employees, in a City-operated facility, under color of City authority; and (b) under New York state tort law, which this Court has supplemental jurisdiction to adjudicate under 28 U.S.C. § 1367, the City of Buffalo is liable under respondeat superior for the tortious conduct of its employees committed within the scope of their employment. The assault, battery, and negligent application of restraints are actionable both as constitutional violations through Monell and as state law torts under respondeat superior. Plaintiff pleads both theories in the alternative.

158. Municipal liability under Monell v. Dep't of Social Services, 436 U.S. 658 (1978), attaches where a plaintiff shows that a constitutional deprivation resulted from an official policy, custom, or practice of the municipality.

159. The BPD and City of Buffalo have maintained a widespread, well-documented custom of racially discriminatory policing against Black residents, including: (a) accepting white complainants' allegations at face value while discounting Black residents' defenses; (b) using the criminal justice system as a tool of racial intimidation; (c) failing to investigate prior false complaints before making new arrests; and (d) permitting officers to award civil property use to third parties outside any legal process.

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

159A. THE MONELL CUSTOM IS A POLICY OF WILLFUL NON-INVESTIGATION. The BPD's unconstitutional custom is most precisely described not as a policy of discrimination in the abstract, but as a specific, operational policy of willful non-investigation of complaints made by white complainants against Black residents. This policy works as follows: when a white complainant makes a claim, BPD officers accept it without verification; when a Black resident makes a contrary assertion — including assertions backed by documentary evidence, prior judicial rulings, and the BPD's own records — BPD officers decline to investigate. The result is that the white complainant's narrative always prevails, regardless of its accuracy, and the Black resident is repeatedly arrested on claims that no officer has ever independently verified. This is not a policy that requires proof of conscious animus in each individual officer — it is a systemic practice of looking only in one direction that produces racially discriminatory outcomes as reliably as any intentional policy would. This type of systemic willful non-investigation constitutes a Monell custom and practice under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), and its Second Circuit progeny.

159B. PRIOR SETTLEMENTS AND VERDICTS ESTABLISH THE MONELL PATTERN — CITY OF BUFFALO AND ERIE COUNTY. The Monell custom and practice alleged herein is not limited to Plaintiff's own experience. It is documented across multiple federal cases involving the same institutions, the same types of misconduct, and the same constitutional violations. Erie County and the City of Buffalo had actual notice of each of the following prior cases and the constitutional violations they established, yet implemented no corrective policies sufficient to prevent the recurrence of identical conduct against Plaintiff: (a) CITY OF BUFFALO LOCKUP ABUSE — SHAUN PORTER. In a case strikingly similar to Plaintiff's, the City of Buffalo settled a lawsuit filed by Shaun Porter for $300,000 after a Buffalo City Jail cellblock attendant, Matthew Jaskula, shoved Porter — who was handcuffed — face-first into a metal door and dragged him, bleeding and nearly unconscious, into a cell. Surveillance video captured the assault. Two Buffalo police officers present watched and did not intervene — one was observed smiling. Jaskula pleaded guilty in federal court to willfully depriving Porter of his constitutional rights under color of law and was sentenced to 18 months in prison. The City of Buffalo settled Porter's civil suit for $300,000. The parallels to Plaintiff's case are direct: a restrained detainee in a City of Buffalo lockup was physically abused by a cellblock attendant while officers present failed to intervene and one laughed. Despite this prior settlement, the City implemented no policy changes sufficient to prevent the identical pattern of abuse from occurring to Plaintiff in October 2025. (b) CITY OF BUFFALO MEDICAL NEGLECT — NOAH GIUSIANA. In 2023, the City of Buffalo paid $1,050,000 (part of a $2.9 million total settlement) to Noah Giusiana, who was arrested on minor misdemeanor charges, taken to Buffalo Police Central Booking, denied timely medical care despite a serious brain injury, and found unresponsive in his cell hours later. Giusiana suffered a brain injury, nearly died, underwent emergency brain surgery, and was left with permanent cognitive impairments. The City settled

Page 63

claims of false arrest, denial of medical care, failure to train, and failure to properly supervise cellblock staff. This prior settlement placed the City of Buffalo on direct notice that its lockup medical care practices were constitutionally deficient. Despite this notice, Plaintiff was denied a medical run in October 2025, was physically abused when she sought relief, and sustained a permanent nerve injury. (c) ERIE COUNTY ECDA BRADY VIOLATIONS — JOHN WALKER JR. AND DARRYL BOYD. In Walker, Jr. v. The City of Buffalo et al., No. 1:2022cv00520 (W.D.N.Y.), a federal jury in May 2025 awarded John Walker Jr. $28 million in compensatory damages after finding that the Erie County District Attorney's Office maintained a Monell custom and practice of systematically failing to disclose exculpatory and impeachment material in violation of Brady v. Maryland. Separately, in Boyd v. The City of Buffalo et al., No. 1:2022cv00519 (W.D.N.Y.), a federal jury in November 2025 awarded the Estate of Darryl Boyd $80 million — the largest individual wrongful conviction verdict in United States history — after finding that the ECDA's office suppressed at least 19 items of Brady material, presented testimony it knew to be false, and coerced witness statements, all as part of an institutionalized pattern spanning decades. The juries in both cases found that the ECDA had unlawful policies and practices to suppress Brady material and to commit prosecutorial misconduct. These verdicts, both rendered before the filing of this complaint, place Erie County and the ECDA on direct, overwhelming notice that their institutional practices of withholding exculpatory material constitute a Monell pattern of constitutional violations. Despite these verdicts and the decades of misconduct they document, the ECDA under DA Keane withheld from Plaintiff the Brady and Giglio material identified in paragraph 111A of this complaint during an eleven-month prosecution it knew was baseless. (d) BUFFALO POLICE FABRICATED EVIDENCE — JOSUE ORTIZ. In Ortiz v. Stambach, No. 1:2016cv00321 (W.D.N.Y.), a federal jury awarded Josue Ortiz $6.5 million in compensatory and punitive damages after finding that former BPD Detective Mark Stambach fabricated a confession from Ortiz — who suffered from schizophrenia — leading to Ortiz's wrongful conviction and ten years of incarceration for a double murder he did not commit. The Second Circuit upheld this verdict on appeal. Critically, the detective who fabricated Ortiz's confession was subsequently hired as an investigator by the Erie County District Attorney's Office — demonstrating the institutional relationship between BPD's unconstitutional practices and the ECDA's tolerance of officer misconduct. This pattern of BPD officers fabricating or misrepresenting evidence — for which the City of Buffalo was held liable — is directly relevant to BPD's conduct in the present case, where Officer Prana deliberately drafted a misleading arrest complaint under Franks v. Delaware.


159D. PRIOR SETTLEMENTS WITH PLAINTIFF HERSELF ESTABLISH ACTUAL NOTICE. The most direct evidence of BPD's and Erie County's Monell custom is that both institutions have previously settled civil rights claims brought by Plaintiff arising from the same pattern of discriminatory conduct: (a) FIRST ERIE COUNTY SETTLEMENT: Plaintiff previously sued Erie County for discrimination, documenting the same racial double standard in governmental treatment. Erie County settled that discrimination claim and was required to

remediate the issue. Despite this settlement — which constituted an institutional admission of discriminatory conduct — Erie County wrongfully arrested Plaintiff in retaliation, giving rise to a second lawsuit. (b) SECOND ERIE COUNTY SETTLEMENT: Plaintiff sued Erie County Sheriff's Department for the retaliatory arrest. Erie County settled a second time for wrongful arrest. Two prior settlements with the same plaintiff for the same type of conduct — racial discrimination and retaliatory arrest — constitute the clearest possible actual notice to Erie County policymakers that their institutions were engaged in a pattern of unconstitutional conduct. Despite two prior settlements, the conduct continued unabated through the October 2025 arrest. This is deliberate indifference in its most documented form.


159E. THE WILLIAMSON CASE AS NATIONAL MONELL PATTERN EVIDENCE. The Monell custom of BPD and the ECDA — accepting white complainants' property claims without investigation while arresting and prosecuting the Black targets of those claims — is not a local aberration unique to Buffalo. The pending federal case of Williamson et al. v. Morgan County, Georgia et al., No. 3:2026cv00052 (M.D. Ga. 2026), documents the same institutional pattern operating in a different jurisdiction: a Black property owner with a valid deed is repeatedly arrested for being on his own land while law enforcement accepts the white family's competing claims without independent investigation; a judge uses a court proceeding to accomplish a property transfer that the law would not otherwise permit; and the entire governmental apparatus of the county operates in coordination with the white private party's dispossession agenda. The national recurrence of this identical institutional pattern — documented in Buffalo in Plaintiff's case, in Clayton County in the Victor Hill restraint chair prosecution, in Erie County in the Walker and Boyd wrongful conviction verdicts, and now in Morgan County, Georgia in the Williamson federal complaint — establishes that what Plaintiff experienced is not the product of individual officer or prosecutor bias but of an institutionalized, nationally documented custom and practice of racially discriminatory law enforcement that operates consistently across jurisdictions. This national pattern evidence strengthens the Monell claim because it demonstrates that the constitutional violations Plaintiff suffered were not the result of random individual failures but of a systemic institutional practice whose existence was fully knowable to BPD and ECDA policymakers long before Plaintiff's first arrest in 2020.


159F. MICHELLE LONG AND FOIL REQUEST 25-335 — MONELL CUSTOM OF RELEASING PLAINTIFF'S PRIVATE FOOTAGE WITHOUT PRIVACY ANALYSIS. The release of Plaintiff's bodycam footage to Eckert by BPD FOIL Officer Michelle Long on March 7, 2026, constitutes independent Monell evidence of BPD's institutionalized failure to protect the privacy rights of Black residents against whom Eckert has filed complaints. Long received a FOIL request from a person who identified herself as "the victim" in a matter that occurred at 281 Barnard Street — an address that, had Long reviewed BPD's own records, is the home of Plaintiff Carolette Meadows, an active federal civil rights complainant against BPD. Long fulfilled the request in 22 days without: (a) verifying Eckert's claimed victim status against the

incident report; (b) conducting any apparent privacy analysis regarding footage of a non-consenting person on private property; (c) notifying Plaintiff that footage from her private property was being released to a third party; (d) checking whether active federal litigation existed between the requester and the person depicted in the footage; or (e) verifying the statutory basis Eckert invoked, which does not provide the entitlement she claimed. This is not an isolated error by an individual officer. It is a documented institutional practice: BPD accepts Eckert's representations without verification, acts on those representations to Plaintiff's detriment, and does so without any meaningful procedural review — the same pattern that produced fifteen wrongful arrests. Long's name, her title as FOIL Officer, the specific Case ID 1001988251, and the documented 22-day release without privacy analysis constitute the named employee, specific date, specific case ID, and documented decision that Monell requires. Monell v. Dep't of Social Services, 436 U.S. 658 (1978).

159C. THE ECDA'S SANDBAGGED GRAND JURY PRESENTATION — RACIAL DOUBLE STANDARD IN EVIDENCE USE. When Plaintiff sought prosecution of Eckert for deliberately coughing COVID on a lupus patient on camera — conduct Eckert admitted to police — the ECDA under DA Flynn presented the Grand Jury without the video evidence of Eckert's own admission, resulting in a no-bill. The ECDA's selective withholding of available video evidence to prevent indictment of Eckert stands in direct contrast to the ECDA's simultaneous willingness to pursue charges against Plaintiff using the same type of video evidence. The ECDA had video in both cases. For Eckert's conduct — deliberate COVID exposure of a disabled person on camera — they withheld the video. For Plaintiff's conduct — displaying a lawful firearm on her own property — they used video as the basis of prosecution even after the video showed Eckert was not a viable victim. This asymmetric use of available evidence based on the race of the subject is the Monell custom operating in real time. It is not merely a pattern of false charges against Plaintiff — it is a pattern of protecting Eckert from accountability for her own violent conduct while weaponizing the same evidentiary standards against Plaintiff. This constitutes Monell evidence of the most direct and probative kind.

160. Erie County's pattern of conduct — demonstrated by prior NYSDHR findings, prior settlement with Plaintiff for wrongful arrest, ongoing ADA violations by ECDA staff, and retaliatory municipal citations — constitutes sufficient evidence of a Monell custom, policy, or practice. The prior dismissal in 1:21-cv-00449 was based on insufficient evidence at that time. The subsequent events described herein now provide a substantially fuller evidentiary record supporting Monell liability.

161. DA FLYNN AND DA KEANE AS FINAL POLICYMAKERS — PEMBAUR LIABILITY. Both John Flynn (DA, 2020–March 29, 2024) and DA Michael Keane (current DA; distinct from his brother, retired Judge Kevin Keane) were and are the final policymakers for all

prosecution decisions of the ECDA. Under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986), a single deliberate decision by a final policymaker constitutes municipal policy for Monell purposes — even when the decision occurs only once. Each individual prosecution decision made by Flynn and Keane, including the decisions to continue prosecuting Plaintiff across fifteen arrest cycles with zero convictions, individually constitutes an act of the municipality. Accordingly, Erie County is directly liable for each such decision as an act of official county policy.

162. MONELL CUSTOM AND PRACTICE — SECOND CIRCUIT STANDARD. In the Second Circuit, a Monell claim may be maintained against a prosecutor's office by showing the office had a policy or practice that caused a constitutional violation in the plaintiff's case. The Second Circuit's 2025 decision in Chislett v. N.Y.C. Dep't of Educ. reinforced that condonation is action — when supervisors and policymakers refuse to intervene in documented misconduct, that refusal is itself the policy. Here the ECDA's unconstitutional custom includes: (a) accepting Eckert's complaints without independent investigation across fifteen arrest cycles; (b) failing to enforce any protocol requiring review of a repeat complainant's credibility before authorizing arrest; (c) continuing prosecution after learning no valid restraining order existed, the complaining witness was not a viable victim, and the underlying dispute was judicially declared civil; (d) using prosecution as a racial retaliatory instrument against a Black homeowner who had successfully defended against every prior charge; and (e) a prior documented instance in federal case No. 1:21-cv-00449 in which ADA John Schoemick (male) was named as an individual defendant for advising police on charge reduction from a police-issued felony to a misdemeanor before a warrant was issued — investigative-phase conduct that falls outside absolute prosecutorial immunity under Burns v. Reed, 500 U.S. 478 (1991) — yet the ECDA implemented no corrective training, supervision, or policy to prevent recurrence. The ECDA's leadership had actual notice of this pattern through the prior federal litigation and did nothing. This custom is so persistent and well-documented that it constitutes official ECDA policy with the force of law under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

163. DELIBERATE INDIFFERENCE — FAILURE TO TRAIN AND SUPERVISE. Under City of Canton v. Harris, 489 U.S. 378 (1989), a municipality may be liable for failure to train or supervise where that failure reflects deliberate indifference to constitutional rights. The ECDA's own ADA Compliance Officer confirmed that county staff are trained and required to provide chairs upon request — yet that training was openly defied by three ECDA personnel in Plaintiff's presence on February 11, 2025, while she identified herself as disabled. DA Keane, as supervising policymaker, failed to investigate, discipline, or remedy the ADA violation after Plaintiff complained. Retaliatory property citations followed within days. The ECDA's failure across years to train prosecutors on the duty to investigate complainant credibility — despite fourteen prior false complaints from the same person — is itself the moving force behind each constitutional violation Plaintiff suffered.

163A. FAILURE TO TRAIN ON COMPLAINANT CREDIBILITY ASSESSMENT. Neither the BPD nor the ECDA has trained its officers or prosecutors to conduct any credibility review of repeat complainants before authorizing arrest or prosecution. This failure is not an oversight — it is a deliberate institutional choice that enables a single complainant to generate fifteen arrests against the same person without a single officer or prosecutor ever being required to ask whether the complainant's claims are reliable. Under City of Canton v. Harris, 489 U.S. 378 (1989), the need for training in complainant credibility assessment was "obvious" given BPD's and ECDA's own records, which showed the pattern with unambiguous clarity. The failure to train officers to look at their own system's history before making an arrest — a simple investigative step Lt. Danner himself performed in real time at the October 2025 scene — constitutes deliberate indifference to the constitutional rights of persons in Plaintiff's position. The constitutional injury caused by this failure to train is not speculative — it has materialized, repeatedly and predictably, in the form of fifteen unlawful arrests.

164. ACTUAL NOTICE TO POLICYMAKERS. Monell liability attaches where policymakers had actual or constructive notice of unconstitutional conduct and failed to act. Here, both Flynn and Keane had actual notice of: (a) fourteen prior arrests by the same complainant ending without conviction; (b) judicial findings characterizing Eckert's claims as 'dubious'; (c) Judge Wilson's July 2024 dismissal with a civil directive communicated directly to ECDA; (d) Plaintiff's IA complaints, civil rights filings, and FOIL requests; (e) prior NYSDHR discrimination findings and two prior Erie County settlements; and (f) Plaintiff's ADA accommodation requests denied in the presence of ECDA investigators. Neither Flynn nor Keane implemented any corrective policy, imposed any discipline, or directed any investigative review of Eckert's claims. This constitutes deliberate indifference under Canton v. Harris, 489 U.S. 378 (1989).

164A. POLICYMAKERS' WILLFUL CHOICE NOT TO LOOK. The actual notice standard for Monell is satisfied here not only because policymakers had notice of the constitutional violations, but because they had the means to investigate further and deliberately chose not to. Flynn received Plaintiff's Internal Affairs complaints, her prior civil rights filings, and notice of the prior federal lawsuit — and never directed any review of Eckert's complaint history or BPD's enforcement pattern. Keane received the same information, plus the July 2024 Wilson dismissal and the ECDA's own case file showing fourteen prior failed prosecutions — and never directed any review. BPD's Internal Affairs unit received multiple complaints from Plaintiff and closed or ignored them without investigation. Each of these is not a failure of notice — it is an affirmative choice to remain uninformed. Courts have recognized that a policymaker's deliberate refusal to investigate known misconduct is the functional equivalent of ratifying that misconduct. City of St. Louis v. Praprotnik, 485 U.S. 112 (1988) (policymaker ratification of subordinate misconduct can establish Monell liability). The sustained, deliberate non-investigation by BPD and ECDA

policymakers of a documented, years-long pattern of constitutional violations against Plaintiff constitutes both the custom and the ratification necessary to establish full Monell liability.

164B. GRAMAGLIA AND WRIGHT — DOCUMENTED SUPERVISORY RATIFICATION. The Monell custom of BPD was ratified at the highest supervisory levels through documented inaction: (a) GRAMAGLIA: Deputy Commissioner Gramaglia received thirteen direct communications from Plaintiff between December 2020 and March 2021 documenting BPD's pattern of refusing her complaints while accepting Eckert's without investigation. He responded to none of them. Under City of St. Louis v. Praprotnik, 485 U.S. 112 (1988), a policymaker's deliberate failure to respond to documented subordinate misconduct constitutes ratification of that misconduct as official policy. Gramaglia's thirteen non-responses over four months, following a direct promise to address the situation, constitute the clearest possible form of supervisory ratification. (b) WRIGHT: Commissioner Wright served during the 2024-2025 arrests with constructive knowledge of: the Walker and Boyd verdicts establishing the ECDA's Brady suppression pattern; Plaintiff's February 2025 IA complaint; the Fourth Department's 2023 finding that Eckert's cameras were unlawful harassment; and the documented fifteen-arrest pattern in BPD's own records. Wright implemented no corrective policy, reviewed no complaint, and took no supervisory action. His failure to act as a final policymaker with actual and constructive notice of the unconstitutional custom constitutes independent Monell liability under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986).

165. INVESTIGATIVE-PHASE CONDUCT ESTABLISHES MUNICIPAL LIABILITY. Because the ECDA's unconstitutional conduct occurred substantially during the investigative phase — before formal charges, in guiding police at the scene, shaping the arrest complaint, and coordinating detention without a valid order — individual prosecutors and investigators are entitled only to qualified immunity under Burns v. Reed, 500 U.S. 478 (1991) and Buckley v. Fitzsimmons, 509 U.S. 259 (1993). When only qualified immunity applies to individual actors, municipal liability under Monell is not displaced. The ECDA's investigative-phase conduct, carried out pursuant to its established custom of targeting Plaintiff, was the moving force behind each constitutional violation she suffered. Erie County is therefore liable as a municipality for each such violation.

166. SINGLE-INCIDENT POLICYMAKER LIABILITY. Even absent pattern evidence, a single decision by a final policymaker establishes Monell liability under Pembaur v. City of Cincinnati, 475 U.S. 469 (1986). DA Keane's personal decision to maintain prosecution of Plaintiff for eight months after receiving definitive video evidence that Eckert was not a viable victim — made with actual knowledge of fourteen prior false complaints — is a single, deliberate policymaking decision that independently establishes Monell liability without requiring additional pattern evidence.

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

167. PROXIMATE CAUSATION. Each Defendant's conduct was the proximate cause of distinct, identifiable injuries to Plaintiff. But for BPD's unlawful arrest and property seizure, Plaintiff would not have been jailed, denied medical care, or placed in the restraint chair causing permanent nerve injury. But for jail staff's denial of medical care, Plaintiff would not have been in the crisis that led to the restraint chair episode. But for John Doe 1's over-tightening of the shoulder strap, Plaintiff would not have sustained the permanent nerve injury confirmed by objective medical testing on March 26, 2025. But for the ECDA's eleven-month malicious prosecution, Plaintiff would not have suffered prolonged emotional distress, financial hardship, repeated court appearances without disability accommodation, or deprivation of her liberty. But for Eckert's racially motivated campaign, Plaintiff would not have faced fifteen unlawful arrests, public scorn, racial hostility, or the ongoing threat of dispossession from her home. The injuries are documented, permanent, and causally linked to each Defendant's specific acts and omissions.

168. NOMINAL DAMAGES. To the extent this Court finds that Plaintiff cannot establish actual compensatory damages as to any particular constitutional violation, Plaintiff is entitled to nominal damages for each such violation under Carey v. Piphus, 435 U.S. 247 (1978), which held that a plaintiff who proves a constitutional deprivation is entitled to nominal damages even absent proof of actual injury. This is particularly significant as to Plaintiff's First Amendment retaliation claims, where emotional distress damages may require additional evidentiary showing. A nominal damages award on any count would still establish the constitutional violation and support punitive damages against individual defendants acting with the requisite malice or reckless indifference to Plaintiff's federally protected rights. Smith v. Wade, 461 U.S. 30 (1983).

## NOTICE OF INTENT TO CONSOLIDATE WITH CASE NO. 1:21-cv-00449

### Federal Rule of Civil Procedure 42(a)

Upon filing of this complaint, Plaintiff will promptly move this Court, pursuant to Federal Rule of Civil Procedure 42(a), to consolidate this action with the currently pending case No. 1:21-cv-00449 (W.D.N.Y.), presently before Hon. Lawrence J. Vilardo, in which Plaintiff's claims against the Buffalo Police Department for unequal application of law enforcement, disparate treatment, and racial discrimination remain active and ongoing.

A. GROUNDS FOR CONSOLIDATION. Consolidation is appropriate under Rule 42(a) where actions pending before the court involve a common question of law or fact. Both this action and case No. 1:21-cv-00449 involve: (1) the same Plaintiff, Carolette Meadows; (2) the same primary

government defendant, the Buffalo Police Department; (3) substantially identical underlying constitutional claims — racial discrimination, disparate treatment, and unequal application of law enforcement against a Black disabled homeowner; (4) the same private instigator of complaints, Rachel Eckert; (5) the same geographic location and the same underlying property dispute; and (6) an overlapping evidentiary record, including BPD arrest records, Eckert's complaint history, and the pattern of ECDA prosecutorial decisions. Consolidation will prevent duplicative litigation, avoid inconsistent rulings on overlapping facts, preserve judicial resources, and serve the interests of justice. Hendrix v. Raybestos-Manhattan, Inc., 776 F.2d 1492, 1495 (11th Cir. 1985) (consolidation appropriate where cases share common parties, facts, and legal questions); Johnson v. Celotex Corp., 899 F.2d 1281, 1284 (2d Cir. 1990) (district court has broad discretion to consolidate cases sharing common questions of law or fact).

B. CONSOLIDATION RESOLVES THE CLAIM SPLITTING CONCERN. Plaintiff is aware that filing a new complaint while a related action remains pending creates a potential claim splitting issue. Plaintiff addresses this proactively by immediately moving for consolidation upon filing, so that all claims arising from the same underlying course of conduct — the BPD's and ECDA's sustained pattern of racial discrimination against Plaintiff, and Eckert's sustained effort to dispossess Plaintiff of her home — are litigated in a single proceeding before a single judge. This approach is preferable to amendment of the existing complaint in 1:21-cv-00449 because: (1) the new complaint adds defendants and claims that were not part of the original filing, including Wray, Keane, jail staff, Schoemick, and the Fair Housing Act claims against Eckert; (2) the new conduct — particularly the October 2025 arrest, the eleven-month prosecution, and the permanent physical injury — is factually distinct enough to warrant separate initiation; and (3) consolidation rather than amendment avoids any argument that the new claims are barred by the prior dismissals in 1:21-cv-00449, since they arise from different facts and time periods.

C. NO PREJUDICE TO DEFENDANTS. Consolidation will not prejudice any defendant. The BPD defendants in 1:21-cv-00449 are already litigating claims arising from the same pattern of conduct. The new defendants in this action — Keane, Flynn, Schoemick, Wray, jail staff, and Eckert — have not yet been served and will have full opportunity to respond. A consolidated proceeding will allow all parties to conduct unified discovery rather than duplicating depositions, document requests, and expert disclosures across two parallel cases.

D. BASIS FOR RE-FILING AGAINST PREVIOUSLY DISMISSED DEFENDANTS IN THIS NEW ACTION. Plaintiff acknowledges that Erie County, Flynn, Schoemick, and Eckert were dismissed from case No. 1:21-cv-00449 by orders of Hon. Lawrence J. Vilardo dated January 30, 2023 and March 14, 2024. Plaintiff re-files against these defendants in this action on the following distinct grounds, each of which is not barred by the prior dismissals: (i) SCHOEMICK: terminated procedurally following Plaintiff's failure to timely amend; no court

reached the merits of his immunity defense; the investigative-phase immunity question under Burns v. Reed and Buckley v. Fitzsimmons was never adjudicated; no res judicata bar applies; (ii) FLYNN: terminated following failure to amend; re-named here as a Pembaur final policymaker for post-dismissal conduct enabled by his institutional policies; the Keane-era prosecution occurred entirely after the March 2024 order; (iii) ERIE COUNTY: the January 2023 order dismissed Monell claims related to prosecutorial charging decisions without leave to amend; the Monell claims in this action are materially different — built on post-2023 conduct, new ADA violations, retaliatory property citations, and the Keane-era prosecution — and do not refile the same theory that was dismissed; (iv) ECKERT: dismissed for failure to establish a legal right to sue her as a private citizen; that deficiency is now fully cured by the Fair Housing Act framework, 42 U.S.C. §§ 1981, 1982, 1985(3), and Griffin v. Breckenridge, 403 U.S. 88 (1971); her post-2024 conduct — the BANG podcast, the Judge Ward statement, the social media incitement campaign, and the attacks on Black political figures — constitutes entirely new wrongful acts that postdate the prior orders.

## RELIEF REQUESTED

## SCHEDULE OF DAMAGES

Plaintiff sets forth the following itemized damages sustained as a direct and proximate result of the conduct of Defendants, each of which is supported by documented evidence and/or expert medical testimony:

CATEGORY 1 — ECMC EMERGENCY HOSPITALIZATION: $50,000. Plaintiff was transported by ambulance from Buffalo City Jail to Erie County Medical Center on October 11–12, 2025, where she was admitted following jail staff's denial of medical care and the physical injuries inflicted during the restraint chair episode. Plaintiff demands $50,000 in compensatory damages for emergency medical treatment, ambulance transport, hospital stay, physician examination, and all associated costs of the ECMC admission caused directly by Defendants' unlawful conduct.

CATEGORY 2 — EMOTIONAL DISTRESS AND PAIN AND SUFFERING DURING THE PHYSICAL ATTACK: $1,000,000. During the restraint chair episode, Plaintiff was choked, had her nose compressed, and had a shoulder strap embedded in her arm while jail staff laughed at her pain. Plaintiff was conscious throughout, could feel each act of abuse, feared for her life when her ability to breathe was cut off, and experienced extreme terror, humiliation, and helplessness. Plaintiff demands $1,000,000 for the acute emotional distress and physical pain and suffering experienced during the attack itself.

CATEGORY 3 — EMOTIONAL DISTRESS AND PAIN AND SUFFERING WHILE RESTRAINED IN CHAIR: $500,000. For an extended period following the physical assault, Plaintiff remained strapped in the restraint chair with the strap embedded in her arm, her hands turning purple from loss of circulation, experiencing escalating physical pain that drove her to attempt to chew through the restraint strap. During this period, jail staff ignored her cries, laughed at her pleas, and refused to obtain medical assistance. Plaintiff demands $500,000 for the sustained emotional distress and physical pain and suffering experienced during the period of continued improper restraint.

CATEGORY 4 — EMOTIONAL DISTRESS AND SUFFERING FROM DENIAL OF MEDICAL CARE: $100,000. Plaintiff was denied a medical run despite being a lupus patient with multiple underlying conditions requiring daily medication. The denial of medical care precipitated the crisis leading to the restraint chair episode and caused Plaintiff significant suffering, medical distress, and fear for her health. Plaintiff demands $100,000 for the emotional distress and physical suffering caused by the deliberate denial of her medical needs while in Defendants' custody.

CATEGORY 5 — REHABILITATION AND MEDICAL TREATMENT FOR PERMANENT NERVE INJURY: $1,000,000. Specialized diagnostic testing on March 26, 2025, confirmed that Plaintiff sustained a permanent nerve injury to her left arm as a direct result of the improper application of restraint straps by City of Buffalo jail staff. Plaintiff has required and will continue to require ongoing medical treatment, physical therapy, pain management, and rehabilitation for this permanent injury. Plaintiff demands $1,000,000 for past and future medical expenses, rehabilitation costs, and treatment related to the permanent nerve injury.

CATEGORY 6 — FUTURE PAIN AND SUFFERING FROM PERMANENT NERVE DAMAGE: $5,000,000. The nerve injury to Plaintiff's left arm is permanent. Plaintiff will experience ongoing physical pain, limited mobility, sensory impairment, and functional limitations for the remainder of her life as a direct result of Defendants' conduct. Plaintiff demands $5,000,000 for future pain, suffering, and diminished quality of life attributable to the permanent nerve damage inflicted by City of Buffalo jail staff.

CATEGORY 7 — EMOTIONAL DISTRESS FROM NEARLY ONE YEAR OF MALICIOUS PROSECUTION AND COURT APPEARANCES: $5,000,000. From October 2025 through June 9, 2025, Plaintiff was subjected to an eleven-month malicious prosecution that the ECDA itself ultimately conceded was indefensible. During this period, Plaintiff was forced to attend numerous court appearances without accommodation of her disability, was subjected to Defendant Wray's judicial abuse and threats, was forced to navigate repeated attempts to coerce

her into a plea, and lived under the threat of criminal conviction for exercising her lawful rights on her own property. The psychological toll of this sustained, baseless prosecution — added to the fifteen prior wrongful arrests across years — has caused Plaintiff severe, documented, and ongoing emotional distress, anxiety, and mental anguish. Plaintiff demands $5,000,000 for the emotional distress resulting from the malicious prosecution and the years-long campaign of wrongful arrest and prosecution.

CATEGORY 8 — LOSS OF USE AND ENJOYMENT OF PROPERTY: $1,000,000. During Plaintiff's wrongful incarceration, Detective Folts granted Eckert's workers access to Plaintiff's property without authorization, allowing work to be completed on Eckert's home using Plaintiff's land while she sat in jail. Additionally, the restraining order issued in connection with the unlawful prosecution required Plaintiff to retreat into her home whenever Eckert came outside — effectively restricting Plaintiff's use and enjoyment of her own property on her own land at the behest of a neighbor whose complaints have been universally rejected by the courts. Plaintiff demands $1,000,000 for the loss of use and enjoyment of her property, the unlawful use of her land by third parties, and the constructive restriction on her free movement in and around her home caused by the unlawfully obtained and maintained restraining order.

TOTAL COMPENSATORY DAMAGES SOUGHT: $13,650,000 across all categories, exclusive of punitive damages, attorney's fees, costs, interest, and injunctive relief. Plaintiff additionally seeks punitive damages against each individual defendant in amounts to be determined by the jury, reflecting the willful, malicious, and reckless nature of each defendant's conduct.

WHEREFORE, Plaintiff Carolette Meadows demands judgment as follows:

A. Compensatory damages for physical injury, permanent nerve damage, pain and suffering, emotional distress, mental anguish, loss of enjoyment of life and property, and economic losses, including all damages available under New York Civil Rights Law §§ 40, 40-c, 40-d and New York Executive Law § 296;

B. Punitive and exemplary damages against individual Defendants for their willful, malicious, and reckless conduct;

C. Injunctive relief including: (i) a federal judicial inquiry into the BPD, Erie County, and the ECDA to assess the frequency and magnitude of civil rights violations against Black residents; (ii) a court-ordered community oversight panel for the ECDA with subpoena power and direct access to the NYS Attorney General; and (iii) any further injunctive relief necessary to prevent continuing violations of Plaintiff's rights;

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

D. A declaration that Defendants' conduct violated Plaintiff's rights under the First, Fourth, Fifth, and Fourteenth Amendments, the ADA, the Fair Housing Act, and 42 U.S.C. §§ 1981, 1982, 1983, 1985, and 1986;

E. Attorney's fees and costs pursuant to 42 U.S.C. § 1988, New York Executive Law § 297, and all other applicable fee-shifting statutes;

F. Pre- and post-judgment interest; and

G. A preliminary and permanent injunction against Defendant Rachel Eckert as follows: (i) ordering Eckert to remove all posts, videos, and social media content concerning Plaintiff that contain unproven allegations, where the underlying charges have been dismissed or were never substantiated, including specifically all content Eckert published characterizing Plaintiff as a criminal in connection with the October 2025 arrest, given that the ECDA dismissed all charges; (ii) ordering Eckert to remove all videos in which Plaintiff appears partially clothed, in which Plaintiff's home at 281 Barnard Street is visible and identifiable, or in which Plaintiff's vehicle or license plate number is displayed, on the grounds that such content exposes Plaintiff to danger and was used to incite racial hostility and harassment against Plaintiff; (iii) ordering Eckert to remove all social media content concerning Plaintiff's children or family life, given that Eckert has no personal knowledge of Plaintiff's family and any such content is based on hearsay, is not based on personal knowledge as required by any evidentiary standard, and has caused harm to Plaintiff's family relationships and privacy; (iv) enjoining Eckert from publishing any further social media content about Plaintiff, Plaintiff's home, Plaintiff's vehicle, or Plaintiff's family, given the documented history of such posts inciting racial violence, exposing Plaintiff to danger, and being used to further Eckert's racially motivated campaign to dispossess Plaintiff of her home in violation of the Fair Housing Act; and (v) ordering Eckert to remove from all platforms her appearance on the B.A.N.G. podcast and any derivative content wherein Plaintiff's identifying information — including her home address and license plate — was displayed to a white patriot audience in a racially inflammatory context;H. Such other and further relief as this Court deems just and proper.

H. Compensatory damages in accordance with the damages schedule set forth herein, totaling no less than Thirteen Million Six Hundred Fifty Thousand Dollars ($13,650,000.00), itemized as follows: Category 1 — $50,000 for emergency medical treatment at ECMC; Category 2 — $1,000,000 for emotional distress from the October 2025 attack; Category 3 — $500,000 for pain and suffering while restrained; Category 4 — $100,000 for denial of medical care; Category 5 — $1,000,000 for rehabilitation costs for permanent nerve injury; Category 6 — $5,000,000 for future pain and suffering from permanent nerve injury; Category 7 — $5,000,000 for emotional distress from eleven-month malicious prosecution; Category 8 — $1,000,000 for property loss and loss of enjoyment of home; plus punitive and exemplary damages against each

individual defendant in an amount to be determined by the jury at trial, reflecting the willful, malicious, racially motivated, and deliberately indifferent nature of each defendant's conduct.

I. FOIL-Specific Relief: an Order of this Court directing the Buffalo Police Department to: (i) immediately retrieve and destroy, or return to Plaintiff, all copies of bodycam footage released to Rachel Eckert pursuant to fraudulent FOIL Request No. 25-335, Case ID 1001988251, fulfilled by FOIL Officer Michelle Long on March 7, 2026, on the grounds that the footage was obtained through a false instrument in violation of New York Penal Law § 175.30 and constitutes unlawfully obtained litigation evidence; (ii) implement a written privacy review protocol requiring verification of claimed victim status against incident reports before releasing bodycam footage depicting non-consenting persons on private property; (iii) notify Plaintiff in writing within five business days whenever a FOIL request is received seeking footage from 281 Barnard Street, Buffalo, New York 14202, and afford Plaintiff an opportunity to object before any footage is released; and (iv) conduct mandatory FOIL privacy training for all staff authorized to fulfill requests involving bodycam footage of private residences.

J. Sanctions against Defendant Rachel Eckert pursuant to Federal Rule of Civil Procedure 11 and Rule 26(g) for obtaining litigation evidence through a fraudulent filing with a government agency while federal civil rights litigation was actively pending and while the Federal Rules of Civil Procedure governed the parties' conduct regarding discovery and evidence gathering. Eckert's submission of a false victim claim to the Buffalo Police Department on February 13, 2026, to obtain bodycam footage of Plaintiff for use in civil litigation, constitutes an improper end-run around the discovery process in violation of the spirit and letter of the Federal Rules. Plaintiff requests that this Court impose sanctions including attorney's fees, costs, and such further relief as the Court deems appropriate to deter future abuse of government processes to obtain litigation evidence.

K. Such other and further relief as this Court deems just, proper, and necessary to fully remedy the constitutional violations, racial discrimination, property deprivation, physical injury, and sustained campaign of judicially-assisted racial harassment that Plaintiff has endured since March 2020.

The total damages sought across all counts exceed Forty-Seven Million Dollars ($47,000,000) exclusive of interest, costs, and injunctive relief.

## EXHIBITS

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

The following exhibits are incorporated by reference into this Complaint and attached hereto:

Exhibit A — Arrest record / charging instrument, May 2024

Exhibit B — Arrest record / charging instrument, October 11, 2025

Exhibit C — Court case index 805300/2020 (property order referenced by Eckert; actual terms confirming Plaintiff's easement)

Exhibit D — Notice of Claim served October 17, 2025, on the City of Buffalo, BPD, Buffalo City Court, Diane Wray, and NYSAG; correspondence regarding Wray's conduct

Exhibit E — Buffalo City Court Clerk's refusal to provide transcripts, January 28, 2025

Exhibit F — Plaintiff's email threatening subpoena of Judge Wilson, January 28, 2025

Exhibit G — FOIL denial by Erie County re: hallway video footage from ECDA meeting

Exhibit H — NYSDHR complaint and declination

Exhibit I — Documentation of removal of Warren Griffiths and assignment of Karla Zimmerman, March 9, 2025

Exhibit J — Plaintiff's email to court regarding May 5, 2025 courtroom events

Exhibit K — Transcript excerpt from case 805300/2020 reflecting Eckert's admission of intentional racial framing

Exhibit L — Court order from Judge Feroleto directing return of Plaintiff's firearms, July 1, 2025

Exhibit M — BPD Internal Affairs complaint filed by Plaintiff regarding delayed return of firearms, July 7, 2025

Exhibit N — Medical testing results confirming permanent left arm injury, March 26, 2025

Exhibit O — Transcript of court appearance before Judge Ward in which Eckert stated her intent to "make Meadows move" through legal judgment and Sheriff's sale

Exhibit P — Notice of Claim served upon City of Buffalo, Buffalo Police Department, Buffalo City Court, Diane Wray (individually), and the NYS Attorney General, dated October 17, 2025, arising from the October 11, 2025 unlawful arrest, unlawful seizure of firearms, denial of medical care, excessive force by jail staff, and deprivation of property rights

Exhibit Q — Buffalo City Court Order of Dismissal entered by Judge Wilson, July 2024, dismissing May 2024 charges against Plaintiff with directive that the easement dispute was civil in nature and required return to Judge Grisanti for clarification (disposition: charges dismissed; no conviction; civil directive issued)

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

Exhibit R — CPL § 30.30 motion filed by attorney Mrs. Price; ECDA's on-record concession not to contest the 30.30, resulting in dismissal of all October 2025 charges on June 9, 2025 (disposition: charges dismissed on speedy trial grounds; DA conceded; no conviction; prosecution lasted nearly eight months despite absence of viable victim)

Exhibit S — Court order from Judge Feroleto dated July 1, 2025, directing BPD to return Plaintiff's seized firearms, gun bag, lock, and all ammunition; documentation of BPD's failure to issue property receipt at time of original seizure on October 11, 2025 (disposition: court-ordered return; property returned July 10, 2025 only after Internal Affairs complaint)

Exhibit T — Records from all fourteen (14) prior arrests of Plaintiff initiated by Defendant Eckert prior to the October 2025 arrest, including docket numbers, charging instruments, and dismissal orders or acquittals for each (disposition: zero convictions across fifteen total arrests; all charges dismissed or not prosecuted to conviction)

Exhibit U — Prior judicial finding by Judge Kevin Keane (Buffalo City Court, retired; brother of Defendant DA Michael Keane) characterizing Eckert's claims as "dubious"; court order, decision, or transcript reflecting this credibility determination against Eckert (disposition: judicial finding undermining Eckert's credibility; Plaintiff not convicted)

Exhibit V — NYSDHR prior indication of discrimination against Erie County arising from Plaintiff's complaint regarding denial of bathroom access; "secret shopper" test results showing a white individual was granted access while Plaintiff was denied; settlement agreement including Erie County's obligation to open a public bathroom (disposition: discrimination indicated; Erie County settled)

Exhibit W — Settlement agreement between Plaintiff and Erie County arising from prior retaliatory arrest by Erie County Sheriff's deputies at the Erie County building during which Plaintiff was physically injured; confirmation of immediate release secured by Plaintiff's attorney upon notification to EC lead counsel Mike Sargusa (disposition: wrongful arrest; Erie County settled for second time)

Exhibit X — Prior federal lawsuit No. 1:21-cv-00449 (W.D.N.Y.): (a) complaint; (b) order dismissing Erie County and John Flynn for failure to establish Monell claims at that time; (c) order dismissing Rachel Eckert as private citizen; (d) final disposition of that action (dispositions: partial dismissal on Monell grounds; Eckert dismissed as private citizen; basis for current re-filing under continuing wrong doctrine with substantially expanded Monell record)

Exhibit Y — ECMC emergency room records from October 11–12, 2025: (a) EMS transport records from Buffalo City Jail; (b) treating physician's diagnosis of complications from over-tightened restraint straps; (c) multi-hour observation for additional medical complications; (d) EMS intake notation attempting to characterize visit as only for medication, corrected by Plaintiff; (e) triage nurse's admission decision

upon Plaintiff's declaration of physical injury (disposition: emergency admission; injuries documented by hospital physician)

Exhibit Z — Specialized diagnostic test results dated March 26, 2025, confirming permanent nerve injury to Plaintiff's left arm causally linked to improper application of restraint straps by City of Buffalo jail staff on October 11–12, 2025 (disposition: permanent injury objectively confirmed; supports claim for permanent damages)

Exhibit AA — Facebook Live video footage from October 11, 2025 incident recorded by Eckert and/or workers: (a) Eckert's location during incident — not in driveway, not in path of weapon; (b) workers' verbal abuse of Plaintiff including racial slur; (c) absence of fear or distress among parties; (d) continued laughing and taunting during and after Plaintiff displayed firearm (disposition: video was central to June 9, 2025 dismissal by establishing Eckert was not a viable victim)

Exhibit BB — Plaintiff's security camera footage from 281 Barnard Street showing: (a) workers placing all equipment on Plaintiff's property on October 11, 2025 while Eckert's driveway remained empty; (b) workers' return to Plaintiff's property during Plaintiff's detention at direction of Detective Folts; (c) completion of work on Eckert's home using Plaintiff's property without consent or compensation (disposition: documentary evidence of unlawful property use facilitated by BPD)

Exhibit CC — Ret-1/A firearms return form submitted by Plaintiff on or about June 26, 2025, along with vacated restraining order; BPD property office's June 30, 2025 telephone notification requiring a court order in addition to completed forms; BPD's July 7, 2025 "coding error" claim preventing timely return at scheduled appointment; BPD Internal Affairs complaint filed same day (disposition: administrative obstruction confirmed; property returned July 10, 2025 only after IA complaint filed)

Exhibit DD — Plaintiff's February 12, 2025 FOIL emails to Tasha Moore and Kristy Dulak requesting hallway video from ECDA meeting of February 11, 2025; Moore's response disclaiming jurisdiction over hallway; Dulak's denial claiming no video existed and staff names were unknown (disposition: FOIL denied; ADA compliance officer later confirmed training protocol requires chairs be provided upon request, contradicting staff conduct)

Exhibit EE — Municipal property violations issued to trust holding Plaintiff's residence on or about March 11, 2025, within days of Plaintiff's ADA complaints against ECDA personnel; documentation showing cited items were not legitimate violations (disposition: retaliatory citations issued against Plaintiff's property trust; offered as evidence of continuing pattern of governmental retaliation in response to protected activity)

Exhibit FF — BPD Internal Affairs online complaint filed by Plaintiff on February 12, 2025, regarding pattern of unlawful arrest, unlawful property seizure without receipt,

denial of medical care, and discriminatory enforcement; any BPD IA response or closure documentation (disposition: complaint filed; no documented corrective action prior to this lawsuit)

Exhibit GG — ADA Compliance Officer's confirmation that Erie County staff are trained and required to provide chairs to anyone who requests one; identification of the Compliance Officer that Plaintiff located independently after ECDA investigators and ECDA Jane Doe refused to provide the name on February 11, 2025 (disposition: county's own training protocols confirm violations occurred)

Exhibit HH — B.A.N.G. podcast recording or transcript in which Defendant Eckert appeared on a white "patriot" platform, characterized her dispute with Plaintiff in racial terms, and displayed video footage showing Plaintiff, Plaintiff's home at 281 Barnard Street, and Plaintiff's vehicle including visible license plate (disposition: evidence of racially motivated public conduct, incitement, and public identification creating danger to Plaintiff; Fair Housing Act violation)

Exhibit II — Social media posts, screenshots, or records demonstrating: (a) Eckert's ongoing racially framed public campaign against Plaintiff; (b) third-party violent or threatening responses directed at Plaintiff as a result of Eckert's posts; (c) Eckert's posts targeting Black elected officials, Democratic politicians, and nonprofits serving the East Side of Buffalo, with Eckert's stated reason that they "didn't protect her" from Plaintiff (disposition: evidence of racially motivated intimidation campaign and Fair Housing Act violations by private defendant)

Exhibit MM — Emergency Order to Show Cause filed by Rachel Eckert in Monroe County Supreme Court, Index No. E2025001693, dated April 17, 2026, including: (a) proposed Order to Show Cause seeking civil contempt, TRO, and mandatory preliminary injunction directing Plaintiff's removal and exclusion from premises; (b) Eckert's Affirmation in Support dated April 17, 2026, containing materially false statement that Plaintiff "pulled a shotgun on contractors" without disclosing the dismissal of resulting criminal charges on June 9, 2025; (c) Exhibit 1 to OSC — email chain dated April 16–17, 2026, showing Plaintiff's reasonable written notice to Eckert about obstructing siding and Eckert's response; (d) Temporary Restraining Order signed by Hon. Erin S. Skinner, J.S.C., on April 21, 2026 (NYSCEF Doc. No. 81) (disposition: TRO issued based on materially false affirmation; subject to opposition and removal to federal court)

Exhibit NN — Eckert's Demand for Production of Documents dated April 23, 2026 (case E2023007424), seeking all Facebook posts, messages, comments, screenshots, communications with law enforcement, and metadata concerning Plaintiff from January 2020 to present, including deleted content; demand served on Plaintiff and on Debra Jordan at 484 Stockbridge Ave., Buffalo, NY 14215 (disposition: document demand served; demonstrates Eckert's coordinated

use of multiple simultaneous legal proceedings against Plaintiff as part of ongoing pattern of judicial harassment)

Exhibit OO — Eckert's Verified Complaint in Index No. 805547/2022 (Erie County), later transferred to Monroe County as E2025001694, filed May 2022: (a) seven causes of action against Plaintiff including malicious prosecution and abuse of process arising from Plaintiff's own federal civil rights filing No. 1:21-cv-00449; (b) admission at paragraph 41 that an Erie County Grand Jury did not indict Eckert on the COVID coughing charge — because the ECDA failed to present the video evidence of Eckert's own admission; (c) admission at paragraph 43 that Hon. Justice Dennis Ward warned Eckert her filing pattern constitutes judicial harassment or misuse of courts; (d) express characterization of Plaintiff's federal civil rights lawsuit as "false," "fabricated," and "made in bad faith" (disposition: second retaliatory defamation lawsuit filed while Plaintiff's federal civil rights case was pending) (Erie County), later transferred to Monroe County as E2025001694, filed May 2022: (a) seven causes of action against Plaintiff including malicious prosecution and abuse of process arising from Plaintiff's own federal civil rights filing No. 1:21-cv-00449; (b) admission at paragraph 41 that an Erie County Grand Jury dismissed all charges arising from the September 2021 COVID coughing incident for lack of probable cause; (c) admission at paragraph 43 that Hon. Justice Dennis Ward warned Eckert that her filing pattern constitutes judicial harassment or misuse of courts; (d) description of Class A felony biological weapon charge brought against Plaintiff for coughing, dismissed by Grand Jury; (e) express characterization of Plaintiff's federal civil rights lawsuit as "false," "fabricated," and "made in bad faith" (disposition: second retaliatory defamation lawsuit filed while Plaintiff's federal civil rights case was pending; demonstrates coordinated multi-front litigation harassment campaign against Plaintiff)

Exhibit PP — Eckert's Verified Complaint in Index No. 808096/2021 (Erie County), later transferred to Monroe County as E2023007424, filed June 2021: (a) defamation, abuse of process, and IIED claims against Plaintiff and five Black community members — Nathan Boyd, Capucine Philson, Janate Ingram, Evilys Torres, and Debra Jordan A.K.A. Neureuther — who publicly supported or defended Plaintiff; (b) Eckert's own complaint uses the phrase "race war" three times, establishing that Eckert herself introduced racial framing into the dispute; (c) confirmation that Eckert operates "Mobile Tax" business at 277 Barnard Street; (d) Eckert's targeting of Black teachers, community members, and political figures who supported Plaintiff demonstrating the racial scope of her campaign (disposition: first retaliatory defamation lawsuit filed same year as Plaintiff's federal civil rights complaint; demonstrates Eckert's pattern of using litigation to suppress Black community support for Plaintiff)

Exhibit QQ — Fourth Department Decision, Meadows v. Eckert, 2023 NY Slip Op 04065 (4th Dept July 28, 2023) (Whalen, P.J., Peradotto, Lindley, Greenwood, JJ.): Plaintiff-Respondent:

Carolette Meadows; Defendant-Appellant: Rachel Eckert. (a) AFFIRMED order directing Eckert to reposition her cameras — Fourth Department found Plaintiff proved Eckert directed cameras at Plaintiff's property without consent and with intent to harass under Civil Rights Law § 52-a, and that Eckert uploaded video of Plaintiff to social media with no purpose but to harass her; binding judicial finding of unlawful surveillance and harassment by Eckert against Plaintiff; (b) REVERSED Judge Grisanti's award of a permanent easement to Plaintiff over the 1¼ to 1¾ foot strip of the 8-foot concrete driveway on Eckert's side of the property line — court found Plaintiff did not establish prior unity of title or absolute necessity as she could park on the street; (c) NO easement has ever been granted to Eckert over Plaintiff's property by any court (disposition: binding appellate finding that Eckert's cameras were unlawful harassment; Eckert's claimed easement over Plaintiff's property has never been legally validated)

Exhibit RR — Audio recording made by Plaintiff of her conversation with ADA John Schoemick at Buffalo City Court on July 31, 2020, in which Schoemick: (a) acknowledged "the police didn't do their job"; (b) stated that because Eckert "wasn't arrested, the claim can't be that serious"; (c) reduced Eckert's felony assault charge — for an attack causing Plaintiff's concussion, collapsed lung, and two-day hospitalization — to a misdemeanor without reviewing any medical records, photographs, or police bodycam footage; and (d) told Plaintiff to accept the misdemeanor "or nothing at all." This recording constitutes direct evidence of ADA Schoemick's investigative-phase conduct and racial bias in the ECDA's handling of criminal complaints against Eckert. NOTE TO PLAINTIFF: If this recording has been preserved, it should be produced as Exhibit RR. If it no longer exists, note the circumstances of its loss. If it was produced in prior litigation, reference that production.

Exhibit SS — Documentation of Plaintiff's direct communications with Deputy Commissioner Joseph Gramaglia: (a) December 2020 initial contact and Gramaglia's response stating he would contact Chief Joyce; (b) thirteen subsequent unanswered communications dated January 5, 6, 7, 11, 19, 2021; February 23, 24, 25, 2021; and March 1, 8, 12, 16, 18, 2021; (c) any email headers, sent confirmations, or other documentation confirming transmission and non-response (disposition: thirteen documented direct communications to the Deputy Commissioner of BPD reporting racial discrimination by his officers; zero responses; pattern of supervisory ratification through deliberate non-engagement).

Exhibit TT — Eckert's RAP sheet as contained in ECDA prosecution file obtained by Plaintiff via FOIL, showing prior charges including two assaults, trespass, harassment, telephone harassment, larceny, and endangering a child, with no dispositions or complaint documents included in the ECDA's file (disposition: demonstrates ECDA accepted and pursued Eckert's complaints without any review of her own criminal history, while simultaneously pursuing Plaintiff across fifteen arrests without a single conviction).

Exhibit UU — Documentation of May 2, 2022 incident: (a) police report showing Eckert violated her order of protection by making statements to Plaintiff; (b) documentation of Eckert's son placing Plaintiff in a chokehold during the confrontation; (c) DA's charging documents showing assault charge added against Plaintiff despite no injuries to Eckert; (d) prior ECDA reduction of Eckert's felony assault charge (which caused Plaintiff's hospitalization) to misdemeanor for comparison (disposition: asymmetric charging demonstrates racial double standard — Eckert's hospitalization-causing assault reduced; Plaintiff's response to being choked escalated to assault charge).

Exhibit VV — Article 78 Petition filed on or about April 23, 2021 by Plaintiff in New York State Supreme Court against: (1) Buffalo Police Department; (2) Craig Hannah, Chief Judge of Buffalo City Court; (3) Buffalo City Court; (4) Erika Webb, Buffalo City Court Clerk; and (5) New York State Attorney General. The petition sought a court order authorizing Plaintiff to exercise the right of private prosecution against Defendant Eckert, after over one year of documented refusals by BPD and the ECDA to investigate, charge, or prosecute Eckert for her documented conduct against Plaintiff, including the May 23, 2020 felony assault. The Article 78 was denied. (Disposition: definitive evidence of complete denial of access to courts and equal protection of the laws by April 2021; formal judicial notice to the New York State Attorney General of racially discriminatory law enforcement in Buffalo; AG took no action despite formal notice)

## CERTIFICATION

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: ___5/14/2026___

Respectfully submitted,

Carolette Meadows, Pro Se Plaintiff

*Meadows v. Buffalo Police Dept., et al. — Amended Federal Complaint*

281 Barnard Street

Buffalo, NY 14202

NOTE TO THE COURT: Plaintiff is filing this action pro se and respectfully requests that this Court liberally construe this pleading pursuant to Haines v. Kerner, 404 U.S. 519 (1972).

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.    *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Carolette Meadows

**DEFENDANTS**

Buffalo Police, City of Buffalo, Diane Wray, Erie County District Attorney, Michael Keane, John Flynn, Det Folts, etal

**(b)** County of Residence of First Listed Plaintiff    Erie
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    erie
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
pro se 281 Barnard St Bflo., NY 14206

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. §§ 1981, 1982, 1983, 1985, 1986; 42 U.S.C. §§ 3604, 3617, 3631; 42 U.S.C. § 12132

Brief description of cause:
Civil rights violations, racial discrimination, malicious prosecution, excessive force, denial of equal protection, Fair Housing Act violations, and ADA '

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
$13,650,000

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☒ Yes    ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE
05/13/2026

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE LJV    MAG. JUDGE _____